

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**FILED**

J.N

JUL 1 7 2008

Jul 17 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>ex rel. WALTER L. HILL, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 08 C 2404 |
| | ) | |
| JAY MERCHANT, Acting Warden, | ) | The Honorable |
| | ) | Samuel Der-Yeghiayan, |
| Respondent. | ) | Judge Presiding. |

## TO THE CLERK OF THE UNITED STATES DISTRICT COURT

In compliance with Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts, the following exhibits are being filed with respondent's Answer to the above-captioned petition for writ of habeas corpus:

Exhibit A:  Transcript of bench trial in *People v. Hill*, No. 04-C4-41169 (July 25, 2005);

Exhibit B:  Rule 23 order, *People v. Hill*, No. 1-06-0928 (Ill.App. 2007);

Exhibit C:  Def. Br. in *People v. Hill*, No. 1-06-0928;

Exhibit D:  People Br. in *People v. Hill*, No. 1-06-0928;

Exhibit E:  Def. Reply Br. in *People v. Hill*, No. 1-06-0928;

Exhibit F:  PLA in *People v. Hill*, No. 105686; and

Exhibit G:   Order denying PLA in *People v. Hill*, No. 105686.

July 17, 2008                                    Respectfully submitted,

                                                 LISA MADIGAN
                                                 Illinois Attorney General

                              By:    _____

                                                 ERIN M. O'CONNELL, Bar #6283650
                                                 Assistant Attorney General
                                                 100 W. Randolph Street, 12th Floor
                                                 Chicago, IL 60601-3218
                                                 PHONE:  (312) 814-1235
                                                 FAX: (312) 814-2589
                                                 EMAIL: eoconnell@atg.state.il.us

1     STATE OF ILLINOIS    )
                         ) SS.
2     COUNTY OF C O O K    )

3       IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
        MUNICIPAL DEPARTMENT-FOURTH MUNICIPAL DISTRICT
4

    THE PEOPLE OF THE           )
5     STATE OF ILLINOIS,          )
                               )
6               Plaintiff,     )
                               )
7     -vs-                   ) No. 04-C4-41169
                               )
8     WALTER L. HILL            )
                               )
9             Defendant.     )

10                      BENCH TRIAL

11            REPORT OF PROCEEDINGS of the Trial

12    before the Honorable THOMAS M. TUCKER, on the 26th

13    day of July, 2005.

14         APPEARANCES:

15         HON. RICHARD A. DEVINE,
         State's Attorney of Cook County,
16         BY: MS. KELLYN DOYLE and MR. FRANK SERIO,
         Assistant State's Attorneys,
17         on behalf of the People of the
         State of Illinois;
18
        MR. EDWIN A. BURNETTE,
19         Public Defender of Cook County,
         BY: MR. CRAIG ROSENTHAL,
20         Assistant Public Defender,
         on behalf of the Defendant.
21

22

23

    CHRISTINE E. WEBER, CSR No. 084-001403
24    Official Court Reporter
    Circuit Court of Cook County, Illinois

1                    THE COURT:  Mr. Hill, please.

2                        (Pause.)

3                    THE COURT:  Hi, Mr. Hill.  Good morning.

4                        Mr. Hill, sir, you are charged with

5       residential burglary.  That's a Class 1,

6       nonprobationable offense.  It's punishable by 4 to

7       15 in the penitentiary, 15 to 30 years on extended

8       term.

9                        As I indicated, it is

10      nonprobationable.  Fines can range up to $25,000.

11      Any penitentiary sentence would be followed by a

12      period of two years mandatory supervised release,

13      which is a form of parole.

14                       Understanding -- do you understand the

15      charge?

16                   THE DEFENDANT:  Yes.

17                   THE COURT:  And the possible penalties?

18                   THE DEFENDANT:  Yes.

19                   THE COURT:  Understanding the charges

20      before the Court and the possible penalties, sir,

21      how do you plead?

22                   THE DEFENDANT:  Not guilty.

23                   THE COURT:   When you plead not guilty,

24      sir, you have certain rights.  You have a right to

1    have a trial by this Court or a jury.

2                    A jury is where people from the

3    community would be brought to court, and you along

4    with your attorney would participate in the

5    selection of 12 individuals who would decide your

6    innocence or guilt, not this Court.  Any verdict

7    returned by a jury must be unanimous, meaning all 12

8    jurors must sign and agree to the verdict before it

9    can be returned.

10                    This, sir, is a signed waiver of your

11   right to trial by jury.  It appears to have your

12   signature.  Is that your signature?

13              THE DEFENDANT:  Yes, sir.

14              THE COURT:  You signed that because you

15   wish to waive or give up that right, is that

16   correct, sir?

17              THE DEFENDANT:  Yes, sir.

18              THE COURT:  All right.  That will be made

19   part of the record.

20                    There's a motion to exclude witnesses

21   joined by the parties.

22              MS. DOYLE:  So joined, Judge.

23              THE COURT:  Any other motions, Craig,

24   before going to trial?

1              MR. ROSENTHAL:  No.

2              THE COURT:  Does the State wish to address

3      the Court with an opening statement?

4              MS. DOYLE:  Sure, Judge.

5                  Judge, you're going to hear --

6              THE COURT:  No.

7                  Counsel, please go to the counsel

8      table with your client.

9                  Kelly, please go to the lectern.

10             MS. DOYLE;  Judge, you're going to hear

11     evidence today that will prove the defendant guilty

12     beyond a reasonable doubt.

13                 It's a circumstantial case, but

14     circumstances will show that there's no doubt that

15     this man, Mr. Walter Hill, entered the home of

16     Mr. and Mrs. Robert and Kathleen Bily while they

17     went and took their children for a test that

18     Saturday of October 30, 2004.

19                 You're going to hear Mr. and Mrs. Bily

20     testify that they left their house and they saw

21     Mr. Walter Hill standing at the edge of the

22     driveway, and they thought it was odd and they

23     thought maybe he was going to walk past their car

24     before they backed out of their driveway.  But he

1   didn't; he just stood there for a long period of

2   time.  So strange that Mrs. Kathleen Bily even said

3   to her husband I don't know why this guy's standing

4   here, maybe he's trying to pass by my car before I

5   pull out.  And he didn't.

6            As she backed out, she looked over her

7   left shoulder and kept staring back at Mr. Hill.

8   Then they dropped eye contact with him before she

9   left to go to McDonald's that day.

10           Her husband took her to McDonald's.

11   They got some coffee, and then she was dropped off

12   at work where she started at 9 a.m.  Before she

13   could even swipe in that day, her husband made a

14   phone call to her and asked why she left the house

15   in disarray.  She told her husband that she didn't

16   know what he was talking about; she didn't leave

17   anything in disarray at the house.  He said I think

18   we've been robbed.  That's when he picked her back

19   up from work and called the Northlake Police

20   Department.

21           At that time, the officers came over

22   and met Mr. and Mrs. Bily and went through the items

23   that were missing.  Included in those items was a

24   Sony Xbox and a Camcorder, as well as their

1    children's backpacks, CD player, headphones and two

2    pocket watches.

3              The next few days, the Northlake

4    Police Department tried to develop leads as to where

5    or how these items may have disappeared, and they

6    were able to develop a lead which led them to the

7    Village Jewelry and Loan Pawn Shop; and when they

8    went there, they learned that a Sony Xbox with the

9    same serial number and a Camcorder with the same

10   serial number were both sold on that same morning,

11   October 30, 2004, at 10:15 a.m., shortly after they

12   discovered that their house was burglarized.

13             Corporal Ortiz was able to go to that

14   pawn shop and learned who turned the pawn shop items

15   in and received $100, and he was able to develop

16   from the pawn shop receipt the name and Social --

17   State ID number of Mr. Walter Hill who signed for

18   turning in those items.

19             At that time, the corporal returned

20   back to the Northlake Police Department and pulled

21   up the information that he could glean from the

22   information on the pawn shop receipt and was going

23   to try and develop an advisory form for his police

24   department, just with a photo, keep on the lookout

000077

1     for this person that's a possible suspect for this

2     residential burglary.

3               Before he could even distribute that,

4     Mr. Hill was picked up on another case; and that is

5     when Corporal Ortiz then goes in to where he is at

6     in the Northlake Police Department and he is read

7     his Miranda rights.  He refuses to make any

8     statements to the police, and it's at that time that

9     Mr. Ortiz -- Corporal Ortiz then develops a lineup

10    in which you will hear both the pawn shop person,

11    Mr. Ray Tome, T O M E, and Miss Kathleen Bily were

12    able to identify this defendant as the person that

13    she saw outside of her house on the morning of

14    October 30th and that Ray Tome took the items that

15    were missing from her house and turned in shortly

16    after that robbery on October 30, 2004.

17              THE COURT:  Counsel?

18              MR. ROSENTHAL:  Judge, actually there is

19    one matter that I neglected to bring to your

20    attention.  There is an officer I subpoenaed, an

21    Officer Filskov from the Northlake Police

22    Department.

23              I contacted the Northlake Police

24    Department this morning.  They indicated that he's

000078

1   sick, he has pneumonia, he was in the hospital last

2   night.  He's not here.

3               I do believe we're going to be able to

4   complete this case today.  However, it's possible I

5   might need this officer to prove up some

6   impeachment.

7               I just want to bring that to your

8   attention --

9          THE COURT:  Thank you.

10         MR. ROSENTHAL:  -- only because I should

11  have mentioned it before we --

12         THE COURT:  No.

13         MR. ROSENTHAL:  -- started opening but --

14         THE COURT:  It's as simple as this.  If the

15  officer is necessary, you'll be given time to have

16  him here.

17         MR. ROSENTHAL:  Thank you.

18               Judge, this case is very

19  straightforward, very simple.  The central issue in

20  this case is whether or not there's any affirmative

21  evidence to show defendant entered into the

22  residence.  There will be no evidence whatsoever to

23  show that defendant entered into the residence in

24  question.

000079

1              You will hear some evidence about him

2    being near the property, and you will hear some

3    evidence about him supposedly pawning items the same

4    day.  But there's going to be no affirmative proof

5    whatsoever that he entered the residence.  This is a

6    case that involves a single count of residential

7    burglary.  We don't believe the State's going to

8    meet their burden.  We're going to ask for a finding

9    of not guilty.

10             THE COURT:  Okay.  State?

11             MS. DOYLE:  State first calls Miss Kathleen

12   Bily.

13                  (Pause.)

14             THE COURT:  Raise your right hand.

15                  (Witness sworn.)

16             THE COURT:  Have a seat.  That black, round

17   thing there is a microphone.  You don't have to lean

18   into it.  Just pull your chair up, please, and keep

19   your voice up to the best of your ability, okay?

20             THE WITNESS:  Okay.

21             THE COURT:  All right.  You're all set.

22             THE WITNESS:  Sure.

23

24

000080

```
 1                    KATHLEEN BILY,

 2    called as a witness herein, having been first duly

 3    sworn, was examined and testified as follows:

 4                   DIRECT EXAMINATION

 5    BY MS. DOYLE:

 6         Q.    Hi, Kathleen.  Can you please state your

 7    first and last name and spell it for the court

 8    reporter.

 9         A.    Kathleen Bily, K A T H L E E N   B I L Y.

10         Q.    And where do you live, Miss Bily?

11         A.    437 Haber, Northlake.

12         Q.    And who do you live there with?

13         A.    My husband and my twins.

14         Q.    And how old are your twins?

15         A.    Thirteen -- well, they're fourteen now.

16         Q.    Fourteen?

17         A.    Uh-huh.

18         Q.    And I'm going to turn your attention to the

19    date of October 30, 2004.

20         A.    Uh-huh.

21         Q.    Where were you on that morning and what did

22    you do that morning?

23         A.    Where was I?  I was at home.

24         Q.    Approximately 8:30 in the morning, where
```

000081

1   were you that morning?

2       A.   Approximately 8:30 I was at home leaving

3   for work.

4       Q.   And what did you do when you left for work?

5       A.   Exited my gate from my backyard with my

6   husband and --

7       Q.   And were the doors to your house locked at

8   that time?

9       A.   Absolutely.

10      Q.   And how about windows?

11      A.   All windows except for the bathroom window

12  was open.

13      Q.   And when you left for work that morning and

14  you exited your gate, did you see anything unusual?

15      A.   Yes.   There was a man standing by the lamp

16  post at the end of my driveway.

17      Q.   And why was that strange?

18      A.   Because I've been in this home for 15 --

19  over 15 years, and I didn't recognize him.   I'm a

20  one-block street.

21      Q.   What was that man doing?

22      A.   Standing there looking towards our house.

23      Q.   And was he still -- was he on the street --

24           MR. ROSENTHAL:   Objection as to what he was

1   looking at.

2            THE COURT:  Overruled.

3   BY MS. DOYLE:

4        Q.   Was he on the street, the driveway, the

5   sidewalk?  Where exactly was he standing?

6        A.   He was standing in my yard by the street

7   light.

8        Q.   And --

9        A.   In the grass.

10       Q.   And what did you do when you saw him?

11       A.   Nothing.  I proceeded to get into my van.

12       Q.   And was anybody with you at that time?

13       A.   Yes.  My husband was in the passenger's

14   seat in my van.

15       Q.   And what's his name?

16       A.   Robert Bily.

17       Q.   And as you got into the van, were you

18   driving or were you the passenger?

19       A.   I was the driver.

20       Q.   And what did you do next?

21       A.   I turned around because my -- I had to back

22   out of my driveway; and instead of using my mirrors,

23   because I'm short, I turn around, and I watched this

24   man at the light by my yard the whole time because I

000083

1    was wondering if he was going to cross behind me and

2    I didn't want to run over him.

3         Q.    And so did you start to back your car up?

4         A.    Yes, I did, very slowly, because I didn't

5    know what he was doing.

6         Q.    And did you see -- what did the man do when

7    you backed up?

8         A.    He stood there.  I gave him plenty of time.

9    I even went real slow to see if he was going to

10   cross, but he never did.  He remained in that spot.

11        Q.    And then did you say anything to your

12   husband at this time?

13        A.    Yeah.  I told him that I thought it was

14   odd.

15        Q.    And why did you think it was odd?

16        A.    It was early in the morning, and he -- this

17   person isn't from my block.

18        Q.    And was he -- did he make any effort to

19   walk in any direction?

20        A.    No.  He stood there.

21        Q.    And what did you do then?

22        A.    I   --

23        Q.    Did you continue backing up?

24        A.    I continued backing up.  I made a

1    three-point turn; so I back up, I pull this way and

2    then I went ahead.

3         Q.    Let me slow down you for a second.

4                When you back up in your van, where is

5    he at?  Is he on your left side or your right side

6    as you back up?

7         A.    He's on the passenger's side.

8         Q.    So you have a direct view of him.

9         A.    Yes.

10        Q.    And how far away from him were you when you

11   started your -- to reverse your van?

12        A.    Twenty feet maybe.

13        Q.    And as you reversed your van, did you get

14   closer to him?

15        A.    Oh, yes.

16        Q.    How close did you eventually come, the

17   closest point as you were coming towards him?

18             MR. ROSENTHAL:  Objection.

19             THE COURT:  Overruled.

20   BY THE WITNESS:

21        A.    Five feet maybe, four feet.

22   BY MS. DOYLE:

23        Q.    And was that at the end of -- when you

24   started to talk about a three-point turn that you

000085

1    did out of your driveway?

2         A.    Right, right.    When I came parallel with

3    him, because he was going the same direction.

4         Q.    Uh-huh.

5         A.    When I -- that means my driver's side

6    window's next to him.

7         Q.    Your street runs what, east and west or

8    north and south?

9         A.    It runs north and south.

10        Q.    So when you were pulling out, you were

11   pulling southbound or eastbound or westbound?

12        A.    My back of my van was northbound.

13        Q.    Okay.

14        A.    And I was headed southbound.

15        Q.    Okay.

16              And so when you did a three-point

17   turn, then you went which direction, east or west?

18        A.    I was going south.

19        Q.    South.   Okay.

20        A.    I faced him.

21        Q.    When you backed up, you faced him.

22        A.    Yes.

23        Q.    And then when you finished your three-point

24   turn, was he on the passenger's side, then, or the

1    driver's side?

2        A.    Driver's side.

3        Q.    And when you did the three-point turn, did

4    you continue to watch him?

5        A.    Yes, I did.

6        Q.    And at that point, did you have a clear

7    view of him as well?

8        A.    Oh, yes.  Perfect view.

9        Q.    And did you -- how long did you look at

10   him?

11       A.    I stared at him for 10, 20 seconds.  I was

12   kind of wondering what he was doing.

13       Q.    And then what did you do after that?

14       A.    Then I continued on my path to McDonald's

15   and then to work.

16       Q.    Do you see the person that you saw that day

17   outside your house here in court today?

18       A.    I sure do.

19       Q.    And can you identify him with an article of

20   clothing?

21       A.    Yes.  He has a white T-shirt on and a beige

22   shirt.

23             THE COURT:  Note in-court identification.

24

000087

1    BY MS. DOYLE:

2        Q.   And you continued to go where on this day?

3        A.   I continued to go north to McDonald's

4    drive-through to get a coffee and then on to work.

5        Q.   And how did you get to work?  Did your

6    husband drop you off at work that day?

7        A.   Yes.  I drove to work and then I got out,

8    and then he drove back home.

9        Q.   And afterwards, did anything unusual happen

10   once you got to work that day?

11       A.   Yes.  I hadn't even punched in when I got a

12   call from my husband telling -- asking me if I had

13   left my jewelry box on my bed awry and if I had

14   pulled all the drawers out of my drawers.

15               MR. ROSENTHAL:  Objection.  Hearsay.

16               THE COURT:  Sustained.

17   BY MS. DOYLE:

18       Q.   What did you tell your husband when he

19   called you that day?

20       A.   I told him no, I had not pulled the drawers

21   out of my dresser and I had not moved my jewelry box

22   from my dresser.

23               MR. ROSENTHAL:  Same objection.

24               THE COURT:  Sustained.

000088

```
 1              MS. DOYLE:  Judge, she was --

 2              THE COURT:  Sustained.

 3   BY MS. DOYLE:

 4       Q.  After you received a call from your

 5   husband, did you then go back home?

 6       A.  Yes, I did.

 7       Q.  And did you then -- what did you do after

 8   you went back home with your husband?

 9       A.  Immediately entered the house and went to

10   my bedroom and found my jewelry box on my bed

11   mangled, with things dumped out of it, and all my

12   drawers in my dresser were hanging out.

13       Q.  Were there any things missing from your

14   house that day?

15       A.  Yes, a lot of things were missing.

16       Q.  What was missing?

17       A.  My Camcorder, the Camcorder case, my

18   infrared light, some lenses for the Camcorder, an

19   Xbox, the Xbox controllers, the Xbox memory card,

20   the vibration thing you put on the -- the device to

21   make it shake for one of the games -- the game was

22   in the Xbox -- my son's backpack, by son's gold

23   cross and chain, some money.  And I can't remember.

24   The list goes on and on.
```

000089

1               Oh, my sons' watches.

2        Q.    And were you able to -- did you call the

3    police that day?

4        A.    Absolutely.

5        Q.    And were you able to give the police

6    information on any of the items that were missing?

7        A.    Yes.  I have the boxes from the Xbox,

8    receipts, and the serial number and box to my

9    Camcorder.

10       Q.    And did you give the police officers that

11   day the Sony Xbox serial number from the boxes?

12       A.    I sure did.

13       Q.    And the Camcorder serial number from the

14   boxes.

15       A.    Yes, I did.

16       Q.    Did you make a report with the police that

17   day, too?

18       A.    Yes.

19       Q.    And after you did make that report, did you

20   hear back from the police on November 4th?

21       A.    Yes, I did.

22       Q.    And where did you go November 4th after you

23   heard back from the police?

24       A.    I was asked if I would come to a lineup at

1    the Northlake Police Department, which I did.

2        Q.   And when you went to the Northlake Police

3    Department, did you actually view a lineup in this

4    case?

5        A.   Yes, I did.

6        Q.   And you said that was November 4th.  At

7    what time was it approximately, do you recall?

8        A.   No, not exactly.

9        MS. DOYLE:  That's okay.

10          I'm going to show counsel what I'm

11    marking State's Exhibit No. 1.

12    BY MS. DOYLE:

13        Q.   Showing you what's been marked as State's

14    Exhibit No. 1, do you recognize that?

15        A.   Yes.  That's my handwriting.

16        Q.   And what is that that you signed off on

17    that day?

18        A.   Lineup photo spread advisory form.

19        Q.   And who asked you to sign that that day?

20        A.   The detective --

21        Q.   Detective Ortiz?

22        A.   The officer told me.

23        Q.   And when you signed that form, what is it

24    that you actually said that you understood before

1     you viewed that lineup?

2               MR. ROSENTHAL:  Objection.

3               THE COURT:  Sustained.

4     BY MS. DOYLE:

5          Q.   What -- I'm sorry.

6                    What time did you sign that form that

7     day?

8               MR. ROSENTHAL:  Objection.

9               THE COURT:  Overruled.

10    BY THE WITNESS:

11         A.   10:51 in the morning.

12    BY MS. DOYLE:

13         Q.   And that was on November 4th, correct?

14         A.   November 4th.

15         Q.   Before you viewed the lineup, did the

16    officer tell you information?

17         A.   The officer informed me that --

18              MR. ROSENTHAL:  Objection.  Hearsay.

19              THE COURT:  Sustained.

20    BY MS. DOYLE:

21         Q.   Did anyone else view the lineup at the same

22    time as you did that day?

23         A.   I don't know --

24              MR. ROSENTHAL:  Objection.

```
 1              THE COURT:  Overruled.
 2    BY THE WITNESS:
 3         A.    There were lots of people viewing the
 4    lineup.  I don't know if they were --
 5    BY MS. DOYLE:
 6         Q.    Were you there at the same time as anybody
 7    else when you saw the lineup?
 8         A.    Yes.  There were lots of us.
 9         Q.    Did anybody else sit with you while you
10    looked at the lineup, or were you by yourself when
11    you looked at the lineup?
12         A.    The officer and myself; that's it.
13         Q.    So there were no other witnesses looking at
14    the lineup at the same time as you.
15         A.    No, no.
16         Q.    And how many people were in the lineup that
17    you saw?
18         A.    Five.
19              MS. DOYLE:  And I'm going to show you what
20    I'm showing counsel.  I'll mark this State's Exhibit
21    No. 2-A, B and C.
22              May I approach the witness.
23              THE COURT:  Uh-huh.
24
```

000093

1    BY MS. DOYLE:

2        Q.   Showing you three photographs that have

3    been marked as State's Exhibit No. 2-A, 2-B and 2-C,

4    do you recognize what that's a picture of?

5        A.   Yes.   That's a picture of the lineup as I

6    saw it.

7        Q.   And that was the way the people looked that

8    you viewed on November 4th?

9        A.   Yeah.

10       Q.   And is everyone in that lineup dressed

11   similarly?

12       A.   Yes.

13       Q.   And how would you describe their dress?

14            MR. ROSENTHAL:   Objection.

15            The question was are the people

16   dressed similarly.

17            THE COURT:   That's a fair question.

18   BY THE WITNESS:

19       A.   Yes, they are.

20   BY MS. DOYLE:

21       Q.   And does anyone in that picture look

22   different than anybody else, or are they all similar

23   race, height, hair color?

24            MR. ROSENTHAL:   Objection.

1           THE COURT:  That would be a motion.

2    Sustained.

3    BY MS. DOYLE:

4        Q.    Do they look similar as far as race?

5        A.    I don't --

6           MR. ROSENTHAL:  Objection.

7           THE COURT:  Sustained.

8    BY MS. DOYLE:

9        Q.    When you looked at that lineup, did the

10   officer ever suggest to you that anyone else -- or

11   anyone else -- who to select from that lineup?

12       A.    No --

13           MR. ROSENTHAL:  Objection.

14           THE COURT:  Overruled.

15   BY MS. DOYLE:

16       Q.    And did you view any of the people in the

17   lineup individually before you saw that lineup?

18       A.    No.

19       Q.    And were you shown any pictures of any

20   individuals before you saw that lineup of anybody?

21       A.    No.

22       Q.    And did you have an opportunity to observe

23   the person in that lineup that you saw outside your

24   house that day?

000095

1          A.    Yes, I did.

2          Q.    And what person was that?

3          A.    No. 5.

4          Q.    And is that what you told the officer that

5     day?

6          A.    Absolutely.

7          Q.    And I'd just like you to mark on this

8     lineup which person it was you identified again.

9          A.    On the picture?

10         Q.    Uh-huh; that's fine.

11                    (Pause.)

12    BY MS. DOYLE:

13         Q.    And you marked that with an X, correct?

14         A.    Right, I did.

15         Q.    And do you see that person today in court?

16               MR. ROSENTHAL:  Objection.

17               THE COURT:  Overruled.

18    BY MS. DOYLE:

19         Q.    Do you see that same person today in court?

20         A.    Yes, I do.

21         Q.    And is that the defendant that you already

22    identified earlier?

23         A.    Yes, it is.

24         Q.    After you viewed the lineup, did you speak

1    to any other witnesses that were going to see the

2    lineup?

3        A.    No.   I immediately went outside.

4        Q.    Were you asked to view any other lineups in

5    this case where you identified anybody that you

6    thought was a suspect in this case?

7        A.    No.

8        Q.    And your identification of the defendant

9    that day was based on what you saw at your house on

10   October 30th of the person standing there?

11             MR. ROSENTHAL:  Objection.  Leading.

12             THE COURT:  Sustained.

13             MS. DOYLE:  I have no further questions.

14             THE COURT:  Cross.

15                  CROSS EXAMINATION

16   BY MR. ROSENTHAL:

17       Q.    Now, ma'am, the incident happened at about

18   8:30 you said, is that right?

19       A.    Yes.

20       Q.    Okay.

21             And on that -- before that day,

22   October 30th of 2004, you had never seen the

23   defendant, correct?

24       A.    Correct.

000097

1           Q.    And you indicated that you were backing out

2      of your driveway, is that right?

3           A.    Uh-huh, exactly.

4           Q.    And this is a two-car garage or one-car

5      garage?

6           A.    One and a half.

7           Q.    And you were the driver and your husband

8      was the passenger.

9           A.    Yes.

10          Q.    And you said you saw the defendant as you

11     were backing out, correct?

12          A.    Yes.

13          Q.    Was he on your property?

14          A.    Yes.

15          Q.    And when you said he would -- where exactly

16     was he on your property?

17          A.    At the light pole at the end of my

18     driveway.

19          Q.    Was he on the driveway, the sidewalk, the

20     grass?

21          A.    Grass.  There is no sidewalk.

22          Q.    There's no sidewalk.

23          A.    Uh-uh.

24          Q.    And the first time you saw defendant was

1    when you were in your car, correct?

2        A.    No.  Coming out of my gate.

3        Q.    Did you have any eye contact with the

4    defendant at that time?

5        A.    I don't think so.  I just noticed that a

6    person was there.

7        Q.    And he -- when you first saw him, he was on

8    your property at that time, right?

9        A.    Yes.

10       Q.    Did you have any conversation with him at

11   that time?

12       A.    No.

13       Q.    Okay.

14             And I assume you went into your garage

15   and got into your car at that point?

16       A.    No.

17       Q.    Your car was already outside?

18       A.    Right.

19       Q.    Okay.

20             And you immediately went into your car

21   and your husband went into the car as well?

22       A.    Uh-huh.

23       Q.    And were your windows up or down?

24       A.    They were up when I got in the car.  I

1    think they were still up when I was driving.

2         Q.    And then you started backing out of the

3    driveway.

4         A.    Uh-huh.

5         Q.    Defendant is still standing on your

6    property.

7         A.    Uh-huh.

8         Q.    Do you see him holding anything at that

9    time?

10        A.    No.

11        Q.    Did you ever see him enter your residence

12   at any time?

13        A.    No.

14        Q.    And you say as you're backing out you get

15   about five feet from him, is that right?

16        A.    More or less.

17        Q.    Is that right?

18        A.    Or less.

19        Q.    And he's on -- as you're backing out, he's

20   on your right side.

21        A.    Yes.

22        Q.    Okay.

23              Does he have his back to you or is he

24   facing you?

000100

1      A.    Facing me.

2      Q.    And do you unroll the windows at that

3  point?

4      A.    No.

5      Q.    Do you unroll the windows at this point?

6      A.    I don't believe so.

7      Q.    Did you ever stop your car when you were

8  about five feet away from him?

9      A.    Yes.

10     Q.    You stopped?

11     A.    Uh-huh.

12     Q.    How long did you stop for?

13     A.    I can't make a three-point turn unless I

14  stop.  I had to stop.

15     Q.    So you didn't stop until you got out onto

16  the street, correct?

17     A.    No.  I did stop towards the end of my

18  driveway to make sure he still wasn't going to cross

19  behind me.

20     Q.    Was the defendant still standing?

21     A.    Still standing.

22     Q.    Still doesn't have anything in his hands.

23     A.    No.

24     Q.    Okay.

000101

1          And when you first stopped, did you --

2    do you again look at the defendant or what did you

3    do?

4        A.    Yeah.   That's what I was looking at.

5        Q.    And what was the defendant doing at that

6    time?

7        A.    Standing there, kind of looking towards --

8    away from me, like he didn't want to make eye

9    contact, was looking down.

10       Q.    And did you have any conversation with him

11   at that time?

12       A.    No.

13       Q.    Did you unroll your windows at that time?

14       A.    I don't remember unrolling the windows.

15       Q.    Did you have a cell phone on you that day?

16       A.    Yes, I did.

17       Q.    Did you contact the police at that?

18       A.    Uh-uh --

19            MS. DOYLE:   Objection.

20            THE COURT:   Sustained.

21   BY MR. ROSENTHAL:

22       Q.    From the time that you first saw the

23   defendant until you pulled away, that lasted about

24   30 seconds, correct?

1      A.   (Nodding head.)

2      Q.   Is that a yes?

3      A.   Yes, yes.  I'm sorry, yes.

4            Could have been a little longer.

5      Q.   I'm sorry?

6      A.   Could have been a little longer.  About 30

7 seconds.

8      Q.   About 30 seconds.

9      A.   Uh-huh.

10      MR. ROSENTHAL:  Nothing further.

11      THE COURT:  Thank you.

12           Anything further?

13      MR. SERIO:  Not based on that, Judge.

14      THE COURT:  Okay.  Be a five-minute recess.

15           Don't discuss your testimony with

16 anyone.  You may not be in the courtroom while

17 others are testifying.  Okay?

18      THE WITNESS:  Okay.

19           (Witness excused.)

20           (Whereupon, a recess was taken.)

21      THE COURT:  Call your next witness.

22      MR. SERIO:  Thank you, Judge.  People call

23 Ray Tome, T O M E.

24           (Pause.)

000103

```
 1              THE COURT:  Raise your right hand.
 2                   (Witness sworn.)
 3              THE COURT:  Have a seat.  The round thing
 4    there is the microphone.  Keep your voice up so we
 5    all can hear you.
 6                   Thank you.
 7                        RAY TOME,
 8    called as a witness herein, having been first duly
 9    sworn, was examined and testified as follows:
10                   DIRECT EXAMINATION
11    BY MR. SERIO:
12         Q.   Good morning, sir.
13         A.   Good morning.
14         Q.   Would you please introduce yourself to the
15    Court, giving us your full name and spelling your
16    name also for the record.
17         A.   Ray Tome, and I work at Village Jewelry.
18         Q.   Can you please spell your last name.
19         A.   T O M E.
20         Q.   And, Mr. Tome, where do you work?
21         A.   Village Jewelry and Pawn Shop.
22         Q.   And where is Village Jewelry and Loan
23    located?
24         A.   24th and North Avenue in Melrose Park.
```

000104

1      Q.    Okay.

2            What are your duties there at this

3      time?

4      A.    I'm an assistant manager.  I do sales and

5      electronics and jewelry.

6      Q.    What kind of shop is Village Jewelry and

7      Loan?

8      A.    Pawn shop.

9      Q.    Were you working there on October 30, 2004?

10     A.    Yes, I was.

11     Q.    Okay.

12           And were your duties on this date

13     similar to the duties you just explained to me?

14     A.    Yes.

15     Q.    Okay.

16           On October 30, 2004, did anybody enter

17     your store that is now today in court?

18     A.    Yes.

19     Q.    Can you please identify that person with an

20     article of clothing they're wearing.

21     A.    Gentleman right there wearing beige.

22           THE COURT:  In-court identification of the

23     defendant.

24           MR. SERIO:  Thank you, Judge.

1   ·BY MR. SERIO:

2       Q.   When the defendant came into your store,

3   did he have anything with him?

4       A.   Yes.  He had a bag with him.

5       Q.   Okay.

6            And where were you at when ·he came

7   into the store?

8       A.   I was in the counter.

9       Q.   Where were you at?

10      A.   The counter.

11      Q.   The counter?

12      A.   Yes.

13      Q.   Did the two of you have a conversation?

14      A.   He stepped up and told me he wanted a

15   couple items.

16      Q.   Did he ever take anything out of that bag?

17      A.   Yes.

18      Q.   What did he take outside of that bag?

19      A.   An Xbox and a Camcorder.

20      Q.   Did you view these items?

21      A.   Yes.

22      Q.   Okay.

23            What did you do at this point?

24      A.   At this point, I asked him what he wanted

000106

1    to do.  He said he wanted to sell them; so I asked

2    for his ID.

3        Q.    And did he give you an ID card?

4        A.    Yes.

5            MR. SERIO:  May I approach, Judge.

6            THE COURT:  Yes.

7    BY MR. SERIO:

8        Q.    Showing you what's been previously marked

9    as People's Exhibit No. 3, do you recognize that?

10       A.    Yes.

11       Q.    What is that?

12       A.    Illinois State ID.

13       Q.    And this photocopy of the ID, is that the

14   same ID that the defendant showed you on October 30,

15   2004?

16       A.    Yes.

17       Q.    And did you make this photocopy of the

18   license?

19       A.    No, I didn't.

20       Q.    And did you make a photocopy of this

21   license?

22       A.    No.

23       Q.    Okay.

24            What did you do with the information

1  on his ID?

2     A.   I just took the information, put it in the

3  computer.

4     Q.   Okay.

5          When you're putting the information in

6  the computer, what other information are you

7  entering into your system?

8     A.   Name, address, Social Security and ID

9  number.

10    Q.   Okay.

11         And that is all the information that

12 you got off that Illinois State ID card.

13    A.   Yes.

14    Q.   Okay.

15         Did you first -- did you -- is there

16 any information about the Xbox and the Camcorder

17 that you entered into your system?

18    A.   Yes.  I took the name of the manufacturer

19 and the serial number.

20    Q.   Okay.

21         (Pause.)

22    MR. SERIO:  May I approach, Judge.

23    THE COURT:  Uh-huh.

24    MR. SERIO:  Thank you.

000108

1    BY MR. SERIO:

2        Q.    I'm showing you what's previously been

3    marked as People's Exhibit No. 4.  Do you recognize

4    that?

5        A.    Yes.

6        Q.    And what is that?

7        A.    That's a buy slip.

8        Q.    What do you mean by "a buy slip"?

9        A.    Meaning it confirms to us that -- it allows

10   us to let us sell it.

11       Q.    And who generates this buy slip?

12       A.    We do.

13       Q.    Did you generate this particular buy slip?

14       A.    Yes.

15       Q.    And how did you do that?

16       A.    By punching it into the computer and it

17   prints out.

18       Q.    Okay.

19             And is there information concerning

20   the seller's name on there?

21       A.    Yes.

22       Q.    And the seller's address, like you said?

23       A.    Yes.

24       Q.    And it also shows the property that's being

1    sold, right?

2        A.    Yes.

3        Q.    Okay.

4              Does it list on there which property?

5        A.    Yes.

6        Q.    And what property is on there?

7        A.    Xbox and Sony Camcorder.

8        MR. ROSENTHAL:  Judge, I'm going to object.

9    I don't think the foundation for the business

10   records has been laid.

11       THE COURT:  Well, it wasn't in the

12   beginning but it is now.  He generated it himself as

13   a result of someone coming into the store.

14              No.  I think there's adequate

15   foundation.

16       MR. ROSENTHAL:  He's not the custodian of

17   the records.

18       THE COURT:  But he's the one that put it in

19   and printed it out.  That's a different -- and he's

20   the one that used it and can identify it as the

21   document he used at the time.

22              No.  Overruled.

23   BY MR. SERIO:

24       Q.    And you also put into your system the

1    serial numbers for each of those items.

2         A.    Yes.

3         Q.    And are those serial numbers indicated

4    there on the buy slip?

5         A.    Yes.

6         Q.    And the serial number for the Xbox is

7    serial No. 185045540606?

8         A.    Yes.

9         Q.    And you entered that yourself.

10        A.    Yes.

11        Q.    And the serial number for the Sony

12   Camcorder is 368697542?

13        A.    Yes.

14             MR. ROSENTHAL:  I'm going to object.

15   There's been no testimony about serial numbers up to

16   this point.

17             THE COURT:  No.  He testified that --

18             MR. ROSENTHAL:  Specific serial numbers.

19             THE COURT:  He took -- he testified that he

20   put the -- he looked at that item, identified them,

21   identified the serial numbers.

22                  So, no, overruled.

23   BY MR. SERIO:

24        Q.    And did you in fact complete the sale with

1    the defendant for these two items?

2         A.   Yes.

3         Q.   And how much did your store pay the

4    defendant for those two items?

5         A.   $100.

6         Q.   Okay.

7              Before you gave him the hundred

8    dollars, did you have him do anything?

9         A.   No.

10        Q.   Was -- did you ask him to sign that buy

11   slip?

12        A.   Oh, yeah.  He had to sign the contract, the

13   buy slip there.

14        Q.   Showing you again People's Exhibit No. 4,

15   is that the defendant's signature?

16        A.   Yes --

17             MR. ROSENTHAL:  Objection.  Basis of

18   knowledge.

19   BY MR. SERIO:

20        Q.   Did he sign that in your presence?

21        A.   Yes, he did.

22        Q.   The defendant signed that in your presence?

23        A.   Yes.

24             THE COURT:  Overruled.

1  BY MR. SERIO:

2      Q.    I'm going to direct your attention now to

3  November 4th of 2004.  Did you have occasion to go

4  to the Northlake Police Department that day?

5      A.    Yes.

6      Q.    And on that day, did you have occasion to

7  view a physical lineup?

8      A.    Yes.

9      Q.    And were there five different men in that

10 lineup?

11     A.    Yes.

12     Q.    And did you recognize anybody in that

13 lineup?

14     A.    Yes.

15     Q.    Who did you recognize?

16     A.    Gentleman right there.

17     Q.    And where did you recognize him from?

18     A.    From when he came into my pawn shop.

19          MR. SERIO:  No further questions.

20          THE COURT:  I'm sorry I have to do this,

21 but I need to take just a one-minute here.  I have

22 to do something now.  Be right back.

23          MR. ROSENTHAL:  Sure.

24               (Whereupon, a recess was taken.)

1          THE COURT:  Okay.  Go ahead.

2                  CROSS EXAMINATION

3    BY MR. ROSENTHAL:

4          Q.   Now, sir, you said that there was an Xbox

5    and a Camcorder pawned, is that correct?

6          A.   Yes.

7          Q.   Okay.

8                  Were there any games or any other

9    items with that Xbox pawned?

10         A.   No.

11         Q.   It was just the Xbox itself?

12         A.   That's right.

13         Q.   Was it missing any cords or did it have

14   anything with it?

15         A.   Complete.

16         Q.   And did it have a vibrator pack or a power

17   pack that goes into the controller?

18         A.   No.

19         Q.   And was there any jewelry pawned?

20         A.   No.

21         Q.   Was there a cross pawned?

22         A.   No.

23         Q.   Was there a Camcorder bag pawned?

24         A.   Bag?  Yes.

1     Q.    Bag?

2     A.    Yes.

3     Q.    Were there separate lenses with the

4     Camcorder?

5     A.    I really don't remember.  I was just

6     looking at the Camcorder.  That was in the bag.

7     Q.    How about a gold chain or watches?

8     A.    No.

9           MR. ROSENTHAL:  Nothing further.

10          MR. SERIO:  Nothing based on that, Judge.

11          THE COURT:  You can step down, sir.

12              You're not to discuss your testimony

13    with anyone.  You may not be in the courtroom while

14    others are testifying.

15          THE WITNESS:  Okay.

16              (Witness excused.)

17          THE COURT:  State?

18          MS. DOYLE:  State next calls Corporal

19    Ortiz.

20          THE COURT:  Okay.

21              (Pause.)

22          THE COURT:  Raise your right hand.

23              (Witness sworn.)

24          THE COURT:  Have a seat.

H-45

1        Keep your voice up, please. And thank

2   you.

3                   CARLOS ORTIZ,

4   called as a witness herein, having been first duly

5   sworn, was examined and testified as follows:

6                 DIRECT EXAMINATION

7   BY MS. DOYLE:

8        Q.   Corporal, can you please state your first

9   and last name and spell it for the court reporter.

10       A.   Carlos Ortiz, O R T I Z.

11       Q.   And where are you employed?

12       A.   City of Northlake Police Department.

13       Q.   And how long have you worked there?

14       A.   Three years.

15       Q.   And were you working there on November 3,

16  2005?

17       A.   Yes.

18       Q.   Did you have occasion to be assigned a case

19  that day?

20       A.   Yes.

21       Q.   And what information were you given that

22  day?

23       A.   It was a residential burglary that occurred

24  on October 30th, and I was provided with what was

```
 1    taken, the general case report and information on a
 2    pawn shop.
 3              MR. ROSENTHAL:  Objection.  Basis.
 4              THE COURT:  Overruled.
 5    BY MS. DOYLE:
 6         Q.   And what did you do with that information
 7    that day once you were assigned the case?
 8         A.   Okay.  I went to a pawn shop.
 9         Q.   Which pawn shop did you go to?
10         A.   It is on 24th and North Avenue.  I --
11         Q.   Is that the Village Pawn Shop?
12         A.   Village, uh-huh, Pawn Shop.
13         Q.   Who did you speak to that day when you went
14    there?
15         A.   I spoke with Ray Tome.
16         Q.   And --
17         A.   Who is an employee there.
18         Q.   And what did you ask Mr. Tome at that time?
19              MR. ROSENTHAL:  Objection.  Hearsay.
20              MS. DOYLE:  It's what he asked.
21              THE COURT:  Overruled.
22    BY THE WITNESS:
23         A.   I asked him -- I explained to him the
24    reason why I was there and asked him to look into
```

H-47

000117

1  his records to see if there was certain items pawned

2  between October 30th and the day I was there, which

3  was November 3rd.

4           MR. ROSENTHAL:  Same objection.

5           THE COURT:  Overruled.

6  BY MS. DOYLE:

7       Q.   And what did he tell you at that time?

8       A.   Okay.  Went through his record and told me

9  that, yes, it was in fact --

10          MR. ROSENTHAL:  Objection to hearsay.

11          THE COURT:  Sustained.

12          MS. DOYLE:  Judge, it's not being offered

13  for the truth of the matter asserted.  It's being

14  offered to show what he did with that information.

15          THE COURT:  He can ask it -- you can ask

16  him if he just received the information.

17              Sustained.

18  BY MS. DOYLE:

19      Q.   Did you receive information that day?

20      A.   Yes.

21      Q.   And what information did you receive?

22      A.   That certain items were turned -- pawned on

23  October 30th around 10:30 -- 10:15 a.m.

24              (Pause.)

1     BY MS. DOYLE:

2       Q.   I'm going to show you what's been marked as

3   People's Exhibit No. 4.   What is that?

4       A.   It's a buy-and-sell receipt from Village.

5       Q.   And is that -- now showing you what has not

6   been marked as a People's Exhibit 3 before, what is

7   that?

8       A.   It's the original of the receipt.

9       Q.   And this Exhibit No. 4 is a photocopy of

10   the receipt?

11       A.   Correct.

12       Q.   And where did you get this receipt?

13       A.   From the pawn shop, from Ray Tome.

14       Q.   And what information did you learn from

15   this receipt?

16       A.   The name of the person that pawned the

17   items, address, Social Security number, State ID

18   number and what was pawned.

19       Q.   And what was pawned?   Were there serial

20   numbers attached to what was pawned that day?

21       A.   Yes.

22       MR. ROSENTHAL:   Objection.   Basis.

23       THE COURT:   Sustained.

24

1    BY MS. DOYLE:

2        Q.    On this receipt, did it list items that

3    were pawned?

4        A.    Yes.

5        Q.    And how were those items described?

6              MR. ROSENTHAL:  Objection.

7              THE COURT:  Sustained.

8    BY MS. DOYLE:

9        Q.    On the -- what was the name of the person

10   that you learned pawned certain items on

11   October 30th?

12             MR. ROSENTHAL:  Objection.

13             THE COURT:  Overruled.

14   BY THE WITNESS:

15       A.    Walter Hill.

16   BY MS. DOYLE:

17       Q.    And what information did you use to learn

18   the identity of Walter Hill?

19       A.    His State ID number.

20       Q.    And that also appeared on that pawn slip?

21       A.    Correct --

22             MR. ROSENTHAL:  Objection.

23             THE COURT:  Sustained.

24

```
 1    BY MS. DOYLE:

 2         Q.    Did you learn that the same items that were

 3    pawned that day by a person named Walter Hill were

 4    the same serial number and items that were also

 5    missing from the case that you were investigating

 6    for residential burglary?

 7         A.    Yes  --

 8              MR. ROSENTHAL:  Objection.

 9              THE COURT:  Hold on a minute.

10                   (Pause.)

11              THE COURT:  No.  You have to put in some

12    sort of a foundation.  That's not how you do this.

13                   (Pause.)

14    BY MS. DOYLE:

15         Q.    Earlier, Officer, you testified that you

16    had received information on this robbery of items

17    and serial numbers that were taken from that house,

18    correct?

19         A.    Yes.

20         Q.    And when you went to the pawn shop that

21    day, did you also receive information there on

22    certain items that were pawned on that same

23    October 30th after the burglary happened?

24         A.    Yes.
```

1        Q.    And were you able to compare the items and

2    the serial numbers from the residential burglary to

3    those items and serial numbers that were on the pawn

4    sheet from Village Jewelry?

5        A.    Yes --

6             MR. ROSENTHAL:  Objection.

7             THE COURT:  Overruled.

8    BY MS. DOYLE:

9        Q.    And did you learn that they were the same

10   items?

11       A.    Correct --

12            MR. ROSENTHAL:  Objection.

13            THE COURT:  Overruled.

14   BY MS. DOYLE:

15       Q.    After you learned that Walter Hill had

16   pawned the same items with the same serial numbers

17   that were missing from the residential burglary,

18   what did you do with that information?

19            MR. ROSENTHAL:  Objection.  Assumes a fact

20   not in evidence.  Beyond the basis of his knowledge.

21            THE COURT:  Yeah.  Wait.

22                (Pause.)

23            THE COURT:  That's sustained.

24            MS. DOYLE:  I'm sorry.

1  BY MS. DOYLE:

2      Q.   What did you do --

3           THE COURT:  What, if anything, did you do

4  next?

5  BY MS. DOYLE:

6      Q.   What did you do next?

7      A.   I gathered information and prepared a

8  patrol bulletin for the Patrol Division.

9      Q.   And as you were preparing that patrol

10 bulletin, what did you learn?

11     A.   That the suspect was detained after an

12 attempt residential burglary by one of our patrol

13 officers.

14          MR. ROSENTHAL:  Objection.

15 BY MS. DOYLE:

16     Q.   Did you --

17          THE COURT:  Now stop it.  That is stricken.

18          MS. DOYLE:  Yes, sir.

19          THE COURT:  That's sustained.  It's

20 stricken.  The Court will not consider that

21 evidence.

22 BY MS. DOYLE:

23     Q.   Did you have an opportunity to learn that

24 Mr. Hill -- a person by the name of Walter Hill was

1    in Northlake custody while you were preparing --

2        A.   Yes.

3        Q.   And when you learned that, what did you do

4    next?  Did you try to do a lineup?

5        A.   Yes.

6        Q.   And what did you -- what was your first

7    steps before you ran the lineup?

8        A.   Contact all my witnesses and victims.

9        Q.   And when were you able to contact all of

10   them to have them come in?

11       A.   Correct.

12       Q.   What date was that?

13       A.   It was on the 4th.

14       Q.   November 4th?

15       A.   Uh-huh.

16       Q.   And did you contact a Ray Tome?

17       A.   Yes.

18       Q.   And did you contact a Kathleen Bily?

19       A.   Yes.

20       Q.   And did you contact a Robert Bily?

21       A.   Yes.

22       Q.   And what date were they able to come into

23   the Northlake Police Department?

24       A.   On the 4th.

1    Q.   And what time did Mrs. Kathleen Bily come

2  in, do you recall?

3    A.   Must have been around 10:30 in the morning.

4    Q.   I'm going to show you what's been

5  previously marked as State's Exhibit No. 1 and

6  State's Exhibit No. 5.

7              (Pause.)

8  BY MS. DOYLE:

9    Q.   Now showing you what's been marked as

10  State's Exhibit No. 4, do you recognize that?

11    A.   Yes.

12    Q.   And what is that?

13    A.   That's a copy of our lineup photo spread

14  advisory form.

15    Q.   And I'm going to ask you to refresh your

16  recollection.  Do you recall what -- take a look at

17  it, and then afterwards I'm going to ask you

18  questions if you're done reading it.

19              (Pause.)

20  BY THE WITNESS:

21    A.   Uh-huh.

22  BY MS. DOYLE:

23    Q.   Do you recall what time Miss Bily came in

24  to view the lineup that day?

H-55

1        A.    Yes.

2        Q.    What time was that?

3        A.    10:51.   That's when she signed for me the

4    advisory form.

5        Q.    And when you gave her the advisory form,

6    what did you indicate to her?

7              MR. ROSENTHAL:  Objection.  Hearsay,

8    relevance.

9              THE COURT:  Overruled -- well, relevance?

10   BY MS. DOYLE:

11       Q.    Did you tell her that --

12             THE COURT:  Sustained.

13   BY MS. DOYLE:

14       Q.    Did you tell Mrs. Bily anything before she

15   viewed the lineup?

16             MR. ROSENTHAL:  Objection.

17             THE COURT:  No.  Go ahead and answer it.

18             THE WITNESS:  I'm sorry?

19   BY MS. DOYLE:

20       Q.    Did you tell her anything before she viewed

21   the lineup, Miss Bily.

22       A.    I read to her what the advisory form

23   stated.

24       Q.    And how long after the crime was it that

1    she came in to view the lineup?

2        A.    Five days.

3        Q.    And when Miss Bily viewed the lineup, did

4    she -- I'm sorry.

5              Did all the witnesses view the lineup

6    together or separately?

7        A.    Separate.

8        Q.    And who was the first person to view the

9    lineup?

10       A.    I believe she was one of the first people

11   that viewed that physical lineup.

12       Q.    And when she viewed the lineup -- excuse

13   me.

14              MS. DOYLE:   I'm now going to show you

15   what's been marked as State's Exhibit No. 2-A, B and

16   C, approaching the witness.

17   BY MS. DOYLE:

18       Q.    Do you recognize what's been marked as

19   State's Exhibit No. 2-A, B and C?

20       A.    Yes.

21       Q.    And what are those?

22       A.    That's a Polaroid photo of the physical

23   lineup performed that day.

24       Q.    Are they -- do they substantially represent

1    the way the lineup appeared that day before it was

2    shown to Miss Kathleen Bily?

3         A.   Yes.

4         Q.   And is it the same lineup that was shown to

5    the other witness, Ray Tome?

6         A.   Yes.

7         Q.   And can you indicate to me whether or not

8    Miss Kathleen Bily was able to identify anybody in

9    the lineup?

10        A.   Yes, she was.

11             MR. ROSENTHAL:  Objection.

12             THE COURT:  Overruled.

13   BY MS. DOYLE:

14        Q.   And who did she identify?

15             MR. ROSENTHAL:  Objection.

16             THE COURT:  Overruled.

17   BY MS. DOYLE:

18        Q.   Who did she identify in the lineup?

19        A.   No. 5.

20        Q.   And do you see No. 5 in court today?

21        A.   Yes.

22        Q.   And what is he -- can you identify him with

23   an article of clothing he's wearing?

24        A.   Jumpsuit --

000128

1              THE COURT:   Offer in-court identification

2    of the defendant.

3    BY MS. DOYLE:

4        Q.   And No. 5 is in fact Mr. Walter Hill?

5        A.   Yes.

6        Q.   And did Ray Tome also view this lineup?

7        A.   Yes.

8        Q.   And was he able to identify anybody in that

9    lineup?

10       A.   Yes.

11       Q.   And what person did he identify?

12       A.   No. 5 --

13            MR. ROSENTHAL:   Objection.

14            THE COURT:   Overruled.

15   BY MS. DOYLE:

16       Q.   And that's also the same person that's

17   sitting in court today.

18       A.   Correct.

19       Q.   Mr. Walter Hill, correct?

20       A.   Yes.

21            (Pause.)

22            MS. DOYLE:   The State has no further

23   questions.

24            MR. ROSENTHAL:   Nothing.

1           THE COURT:  Officer, you can step down.

2    Thank you.

3           Don't discuss your testimony with

4    anyone.  You may not be in the courtroom while

5    others are testifying.  Thank you, Officer.

6               (Witness excused.)

7           THE COURT:  State?

8           MS. DOYLE:  Judge, at this time, we're

9    asking that State's Exhibits 1 through 5 be received

10   in evidence.

11          THE COURT:  Any objection?

12          MR. ROSENTHAL:  No objection.

13          THE COURT:  There being no objection,

14   People's in evidence.

15              (People's Exhibit Numbers 1 through 5

16               were received in evidence.)

17          THE COURT:  Anything further?

18          MS. DOYLE:  No.

19          THE COURT:  Counsel for the defendant?

20          MR. ROSENTHAL:  Motion for directed

21   finding.

22          THE COURT:  Denied.

23          MR. ROSENTHAL:  We would rest.

24          THE COURT:  I'll take a minute here, and

1  I'll be right back and I'll listen to your

2  arguments.

3                    (Whereupon, a recess was taken.)

4           THE COURT:  State, you can begin.

5           MR. SERIO:  Judge, the evidence is very

6  straightforward.  The defendant is there.  He's at

7  the property.  People leave; they go to McDonald's;

8  drop someone off to work.  They come back.  Their

9  house was robbed, the defendant that was there, the

10 same defendant who's inside the pawn shop pawning

11 the victim's property, the same serial numbers, the

12 same models and make, okay?

13                 The time frame, the fact that the

14 defendant is in the pawn shop --

15          THE COURT:  What is the time frame?

16          MR. SERIO:  The defendant was there when

17 the victim left her house, that they went to

18 McDonald's, that they --

19          THE COURT:  Yeah.  At 8:30?

20          MR. SERIO:  Yes, Judge, at 8:30.  And then

21 10:15, the same day, the defendant's in the pawn

22 shop.

23                 Based on that time frame, it is beyond

24 a reasonable doubt that this defendant and only this

1    defendant entered that house, took the Camcorder,

2    took the Xbox and went to the Village Pawn Shop,

3    Judge, okay?

4          Of course he's not going to enter this

5    home and burglarize the home when somebody's around.

6    That's why he's standing around there at the light

7    post waiting for people to leave. That's when he

8    makes his entry when there's nobody around. You

9    have the evidence that he's there at the property,

10    and you have -- at the residence, and you have the

11    evidence that he has the property pawning it, the

12    same evidence -- the same property belonging to the

13    victims.

14          Based on that, there is beyond a

15    reasonable doubt fact that this defendant entered

16    the house and took it, took that property, took it

17    to the pawn shop, took the proceeds, Judge.

18          We ask that you find him guilty of

19    residential burglary.

20          MR. ROSENTHAL: Judge, very briefly.

21          I think what I indicated in my opening

22    statement is exactly on point. There's no evidence

23    whatsoever defendant entered the premises, and

24    that's what you need to find if you find him

000132

```
 1    guilty --

 2              THE COURT:   What about unexplained

 3    possession of stolen property?

 4              MR. ROSENTHAL:   Well, I think this case

 5    might be different had he been charged with theft,

 6    but he is not charged with theft.   He's charged with

 7    residential burglary.   And so the State is still

 8    under an obligation to present some affirmative

 9    evidence that he entered the residence.

10                   The other thing that I would bring to

11    your attention is the complaining witness's

12    testimony about him being on the property.   Why

13    didn't the complaining witness contact the police

14    when he's trespassing on this property?   She clearly

15    suspected something unusual at the time.

16              THE COURT:   Counsel, that was objected to

17    and sustained.

18              MR. ROSENTHAL:   Well, I think it's a

19    reasonable inference from the testimony that you

20    heard that the police were not contacted until the

21    husband came back home and discovered the house in

22    disarray.   But, Judge, I would ask the Court to

23    focus on the issue of entry.   The defendant pawning

24    the items the same day does not give you any
```

000133

```
 1    indication how he came into receipt of those items.
 2    Somebody else could have entered that house, given
 3    the items to the defendant.
 4              You heard no evidence whatsoever that
 5    the defendant was the person inside that house.  We
 6    don't know of any evidence whatsoever about how he
 7    came into those items and, in fact, the items that
 8    were pawned were the Camcorder and the Xbox.  There
 9    were other items that were not pawned.
10              So we would ask for a finding of not
11    guilty.
12         THE COURT:  I'll see you at 1 o'clock.
13              (Whereupon, a luncheon recess was
14                 taken.)
15
16              AFTERNOON SESSION
17         (Approximately 1 o'clock p.m.)
18
19         THE COURT:  People versus Hill.
20              (Pause.)
21         THE COURT:  Okay.  We're back on the
22    record, and I've had an opportunity to review the
23    evidence and judge the credibility and reliability
24    of the witnesses who have testified.
```

000134

1           I find that the testimony of the two

2   civilian witnesses is credible in its identification

3   of the defendant as the person, number one, who was

4   seen at the scene of the residential burglary and,

5   number two, as the person who in fact did sell the

6   items within an hour or two hours of the residential

7   burglary.  So the -- I have sufficient evidence to

8   support the identification of the defendant.

9           Further, I find that the recent,

10  unexplained possession of stolen property, while

11  alone by itself would not be sufficient to support

12  residential burglary, the fact that that recent,

13  unexplained possession is -- has been proven beyond

14  a reasonable doubt and been corroborated by the

15  credible identification of the defendant as the

16  person who was at the scene of the residential

17  burglary.  I find that with all that there is

18  sufficient evidence for a finding of guilty as to

19  residential burglary.

20          There will be a finding of guilty and

21  a judgment on the finding.

22          We'll need a PSI.  What date do you

23  want to come back?

24          MR. ROSENTHAL:  How's August 25th?

1          THE COURT:  Done.

2               Bond's revoked.

3

4          WHICH WERE ALL THE PROCEEDINGS HAD

5          AT THE TRIAL OF THE ABOVE-ENTITLED

6          CAUSE ON JULY 26, 2005.

7

8                  --oOo--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

000136

NOTICE
The text of this order may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.

SIXTH DIVISION
August 17, 2007

No. 1-06-0928

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 04 C4 41169 |
| | ) | |
| WALTER HILL, | ) | Honorable Thomas M. Tucker, |
| Defendant-Appellant. | ) | Judge Presiding. |

## O R D E R

Following a bench trial, defendant Walter Hill was convicted of a residential burglary and sentenced to 14 years' imprisonment. On appeal, defendant contends that the State failed to prove him guilty beyond a reasonable doubt. He argues that his presence near the residence before the burglary and his possession of some of the stolen items do not prove he entered the residence and stole the missing items.

At trial, Kathleen Bily testified that at approximately 8:30 a.m. on October 30, 2004, she and her husband, Robert Bily, were exiting their home on North Haber Court in Northlake. She was on her way to work, and Mr. Bily was accompanying her to drive the car back to the house. As she was leaving, she noticed defendant standing by a lamp post at the end of her driveway. She said this was unusual because she had never seen him before in her 15

1-06-0928

years of residence.  Mrs. Bily got into her car and observed
defendant the entire time she was backing out of the driveway
because she did not want to hit him if he crossed her path.
After backing out of her driveway, she stared at defendant, who
had not moved, for 10 to 20 seconds before driving off.

Shortly after being dropped off at work, Mrs. Bily received
a phone call from Mr. Bily.  When she returned home, she found
her jewelry box dumped out on her bed and all the drawers in her
dresser opened.  She noticed that some jewelry, a camcorder, an
Xbox video game system, a game inside of it, and some of its
accessories were missing.  She called the police to report a
burglary, and was able to give them serial numbers for the Xbox
and camcorder.

Ray Tome testified that on October 30, 2004, he worked as an
assistant manager at Village Jewelry and Loan, a pawn shop
located near North 24th Avenue and West North Street in Melrose
Park.  On that day, defendant came into the shop and sold Tome a
camcorder and an Xbox for $100.  Tome recorded the serial numbers
of the items.

Corporal Carlos Ortiz of the Northlake Police Department
testified that on November 3, 2004, he was investigating the
Bilys' burglary.  Ortiz went to Village Jewelry and Loan, where
he learned that an Xbox and a camcorder were pawned there on
October 30, 2004, at around 10:15 a.m.  The pawned items' serial

1-06-0928

numbers matched the ones provided by Mrs. Bily. Ortiz discovered defendant was the seller, and returned to the station to prepare a patrol bulletin to locate him. However, defendant was already in custody for an unrelated matter.

On November 4, 2004, Ortiz conducted a lineup where both Tome and Mrs. Bily identified defendant.

The trial court found defendant guilty of residential burglary and sentenced him as a Class X offender to 14 years' imprisonment. Defendant timely appeals.

On appeal, defendant contends that the State failed to prove him guilty beyond a reasonable doubt. He argues that his presence near the residence before the burglary and his possession of some of the stolen items do not prove he entered the residence and stole the missing items.

When a defendant challenges the sufficiency of the evidence to support his conviction, this court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. People v. Pollock, 202 Ill. 2d 189, 217 (2002). It is the trier of fact's responsibility to determine the credibility of witnesses, weigh their testimony, resolve conflicts in the evidence, and draw reasonable inferences from the testimony. People v. Williams, 193 Ill. 2d 306, 338 (2000).

1-06-0928


The offense of residential burglary requires the State to
prove that the offender, in pertinent part, knowingly and without
authority entered the dwelling place of another with the intent
to commit a felony or theft therein.   720 ILCS 5/19-3(a) (West
2004).   A defendant's possession of recently stolen property is
sufficient to support a burglary conviction if (1) there is a
rational connection between his possession of stolen property and
his participation in the burglary; (2) his guilt of burglary more
likely than not flowed from his recent unexplained and exclusive
possession of burglary proceeds; and (3) there is evidence
corroborating the defendant's guilt.   People v. Housby, 84 Ill.
2d 415, 424 (1981); People v. Gonzalez, 292 Ill. App. 3d 280, 288
(1997).

Defendant argues that the State has failed to satisfy all
three prongs of the Housby test.   In construing the first prong
of the Housby test, this court has held a rational connection
exists between possession of stolen property and participation in
the burglary if the inference that defendant obtained the items
by burglary is not unreasonable.   Gonzalez, 292 Ill. App. 3d at
288.   In making this determination, the most important factor is
whether defendant's possession is proximate in both time and
place to the burglary.   Gonzalez, 292 Ill. App. 3d at 288.   In
the instant case, defendant sold the stolen property to a pawn
shop located approximately two miles from the Bilys' residence,

1-06-0928

approximately 90 minutes after the items were discovered to be stolen. These circumstances are sufficient to satisfy the first prong of the Housby test. See People v. Caban, 251 Ill. App. 3d 1030, 1034 (1993) (finding that discovering defendant's possession of stolen property four miles from scene of burglary on the same day the burglary occurred satisfied first prong of Housby test).

With respect to the second prong of the Housby test, defendant argues that it was "more likely than not" that another person burglarized the Bilys' residence, fled when Mr. Bily returned home, and then hid or dropped the stolen items which defendant later found. We find defendant's argument to be unpersuasive. Minutes before the burglary occurred, Mrs. Bily observed defendant standing at the end of her driveway. He did not move while Mrs. Bily exited her house, entered her car, and drove away. Furthermore, defendant was in possession of the items and sold them approximately 90 minutes after the burglary occurred. Examining the plausibility of defendant's current theory against the theory and evidence provided by the State at trial, we find it reasonable for the trial court to conclude defendant was "more likely than not" a participant in the burglary as opposed to a mere subsequent possessor of the proceeds.

1-06-0928

Finally, defendant argues there was no corroborating evidence of his guilt. However, corroborating evidence in the form of identifications of defendant by Mrs. Bily and Tome, defendant's presence and actions near the Bilys' residence immediately before the burglary, and his possession and pawning of the items proximate in both time and place to the burglary. We find that this is sufficient corroborating evidence of his guilt. See People v. Burrows, 183 Ill. App. 3d 949, 954-55 (1989) (finding that a defendant's presence near the burglary when it occurred, his presence in a home near the burglary containing the stolen items, and his established possession of the items were sufficient corroborating evidence under the Housby test).

Accordingly, we find the trial court had sufficient evidence before it to support a finding of guilt.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

McNULTY, J., with JOSEPH GORDON and O'MALLEY, JJ., concurring.

- 6 -

No. 1-06-0928

## IN THE

## APPELLATE COURT OF ILLINOIS

## FIRST DISTRICT

| | | |
|---|---|---|
| **PEOPLE OF THE STATE OF ILLINOIS,** | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| -vs- | ) | No. 04 C4 41169. |
| | ) | |
| **WALTER HILL,** | ) | Honorable |
| | ) | Thomas M. Tucker, |
| Defendant-Appellant. | ) | Judge Presiding. |

## BRIEF AND ARGUMENT FOR DEFENDANT-APPELLANT

MICHAEL J. PELLETIER
Deputy Defender

PAMELA RUBEO
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois 60601
(312) 814-5472

COUNSEL FOR DEFENDANT-APPELLANT

**ORAL ARGUMENT REQUESTED**

RECEIVED
CRIMINAL APPEALS
JAN 2 9 2007
300 RICHARD J. DALEY CENTER
RICHARD A. DEVINE
STATE'S ATTORNEY'S OFFICE

EXHIBIT C

**POINT AND AUTHORITIES**                                          Page

**Walter Hill Was Not Proven Guilty Beyond a Reasonable Doubt of Residential Burglary Where the Evidence of His Presence near the Residence Sometime Before the Burglary, and His Possession of a Few of the Stolen Goods Sometime after the Burglary, Did Not Prove That Mr. Hill Ever Actually Entered the Residence and Stole the Missing Items.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

U.S. CONST., amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ILL. CONST., 1970, Art. 1, § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In Re Winship*, 397 U.S. 358 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*People v. Weinstein*, 35 Ill. 2d 467, 220 N.E.2d (1996) . . . . . . . . . . . . . . . . . . . . . . . 8

720 ILCS 5/19-3(a)(2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*People v. Young*, 128 Ill. 2d 1, 538 N.E.2d 453 (1989) . . . . . . . . . . . . . . . . . . . . . . . 8

*Jackson v. Virginia*, 443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*People v. Bartall*, 98 Ill. 2d 294, 456 N.E.2d 59 (1983) . . . . . . . . . . . . . . . . . . . . . . 9

*People v. Jefferson*, 24 Ill. 2d 398, 182 N.E.2d 1 (1962) . . . . . . . . . . . . . . . . . . . . . . 9

*People v. Jones*, 278 Ill. App. 3d 790, 663 N.E.2d 461 (3rd Dist. 1996) . . . . . . . . . . 10

*People v. Mitchell*, 59 Ill. App. 3d 367, 375 N.E.2d 531 (1st Dist. 1978) . . . . . . . . . . 10

*People v. Bean and Wilkinson*, 121 Ill. App. 2d 290, 257 N.E.2d 558 (1st Dist. 1970)  10

*People v. Natal*, 268 Ill. App. 3d 262, 2006 Ill. App. LEXIS 1053

(No. 1-05-1643 November 20, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13, 14, 15

*People v. Housby*, 84 Ill. 2d 415, 420 N.E.2d 151 (1981) . . . . . . . . . . . . . . . . . . . . . . 11

*People v. Johnson*, 96 Ill. App. 3d 1123, 422 N.E.2d 19 (2nd Dist. 1981) . . . . . . . . . 12

*People v. Ross*, 103 Ill. App. 3d 883, 431 N.E.2d 1288 (1st Dist. 1981) . . . . . . . . . . 14

*People v. Ehlert*, 211 Ill. 2d 192, 811 N.E.2d 620 (2004) . . . . . . . . . . . . . . . . . . . . . . 15

## NATURE OF THE CASE

Walter Hill was convicted of residential burglary after a bench trial and was sentenced to 14 years in prison.

This is a direct appeal from the judgment of the court below. No issue is raised challenging the charging instrument.

## ISSUE PRESENTED FOR REVIEW

Whether Walter Hill was proven guilty beyond a reasonable doubt of residential burglary where the evidence of his presence near the residence sometime before the burglary, and his possession of a few of the stolen goods sometime after the burglary, did not prove that Mr. Hill ever actually entered the residence and stole the missing items.

## JURISDICTION

Walter Hill appeals from a final judgment of conviction in a criminal case. He was sentenced on March 21, 2006. (C. 140) Notice of appeal was timely filed on April 11, 2006. (C. 143) Jurisdiction therefore lies in this Court pursuant to Article VI, Section 6, of the Illinois Constitution, and Supreme Court Rules 603 and 606.

## STATEMENT OF FACTS

Walter Hill was charged with a single count of residential burglary. (C. 10) On July 26, 2005, a bench trial was conducted. Kathleen Bily testified that on October 30, 2004, at approximately 8:30 a.m., she and her husband left their home at 437 North Haber Court in Northlake, Illinois; Mrs. Bily was on her way to work. (R. 82) As Mrs. Bily stepped out the back door, she noticed a man, whom she identified in court as Walter Hill, standing on the lawn by the light post at the end of her driveway. (R. 82) She thought it was strange that he was there because she has lived at that location for over 15 years and she did not recognize him. Mr. Hill was standing there looking towards the Bily's house. Mrs. Bily drove while Mr. Bily sat in the passenger seat. (R. 84) As Mrs. Bily backed down her driveway, she watched Mr. Hill at the light post the entire time because she wanted to make sure he did not cross her path as she drove. (R. 84) According to Mrs. Bily, Mr. Hill never moved from his spot. When Mr. Bily testified at the preliminary hearing, however, he said that as they left that morning, he noticed a man walking past the driveway, not standing there. (R. 32)

Mrs. Bily drove to work, and then Mr. Bily returned home. (R. 87) Soon after arriving at work, Mrs. Bily received a phone call from her husband, and he came to pick her up. (R. 88) They went back home and Mrs. Bily saw that her jewelry box had been dumped out onto the bed and the dresser drawers were hanging open. (R. 89) She noticed that some jewelry, a camcorder, and an X-box system as well as games and accessories, were missing. The Bily's called the police and provided them with the serial numbers for the camcorder and X-box. On November 4, 2005, Mrs. Bily identified Walter Hill in a lineup as the man standing by her driveway on the date of the burglary. (R. 90, 95)

-4-

Ray Tome, an employee for Village Jewelry and Loan in Melrose Park, testified that as he was working on October 30, 2004, a man, whom he identified in court as Walter Hill, came into the shop. (R. 104-05) Mr. Hill sold Mr. Tome a camcorder and an X-box system for $100. (R. 112) As part of the transaction, Mr. Tome recorded the serial numbers from the merchandise. (R. 108) Mr. Hill did not try to sell any jewelry or X-box games or accessories to the pawn shop. (R. 114) On November 4, 2004, Mr. Tome identified Mr. Hill in a lineup as the seller of that merchandise.

Corporal Carlos Ortiz of the Northlake Police Department testified that he was assigned to this case on November 3, 2004. (R. 116) After going to the Village Pawn Shop and speaking with Mr. Tome, Corporal Ortiz learned that certain items were pawned on October 30th at around 10:15 a.m.. (R. 118) The serial numbers on the items pawned were the same serial numbers on the items missing from the Bily's home. (R. 122) Corporal Ortiz reviewed the sales slip from the pawn shop and saw that the seller's name was Walter Hill. (R. 120) When Corporal Ortiz got back to the station, he began to prepare a patrol bulletin for Hill, but soon discovered that Mr. Hill was already in custody. (R. 124)

The court found Mr. Hill guilty of residential burglary, noting that Hill's recent, unexplained possession of stolen property, coupled with his presence at the scene before the burglary, was sufficient evidence for a finding of guilt. (R. 135)

On August 25, 2005, defense counsel informed the court that Mr. Hill wanted to proceed *pro se*, and Mr. Hill filed a *pro se* motion for new trial alleging ineffective assistance of trial counsel. (R. 140) Specifically, Mr. Hill alleged that his counsel failed to file a motion to quash arrest and suppress evidence, failed to introduce fingerprint evidence to exculpate Mr. Hill, and failed to interview and call witnesses. (R. 142;

C.43-44) At the same time, defense counsel filed a motion for a new trial alleging that the court erred in finding Mr. Hill guilty because there was no direct evidence that he actually entered the house, and that a "mere hunch" was insufficient to support a finding of guilt.  (R. 139; C. 42)

On September 9, 2005, Mr. Hill filed a *pro se* document entitled "Petition for Appeal," in which he alleged that his conviction was based only on the fact that he sold some merchandise to a pawn shop.  (C. 84)  He also argued that his arrest was illegal because he was arrested for a different crime and held in custody for 24 hours before he was identified in this case.  (C. 85-86)  Mr. Hill also argued that the State itself admitted during discovery that no fingerprints or forensic evidence tied Mr. Hill to the crime.  (R. 85)

On October 4, 2005, Mr. Hill filed a document entitled "Memorandum of Law in Support of Motion for New Trial," which set forth essentially the same arguments as the motion filed on August 25.  (C. 99-101)  One additional point Mr. Hill made in this document was that Mrs. Bily's trial testimony was contradicted by Mr. Bily's preliminary hearing testimony that he did not see Mr. Hill standing by the light post but saw him walking past the driveway.  (C. 101)

On November 1, 2005, Mr. Hill informed the court that, rather than proceeding *pro se,* he would like to be represented by a lawyer other than the public defender that represented him at trial.  (R. 157)  A *Krankel* hearing was conducted on January 25, 2006, to determine the factual basis of Mr. Hill's ineffectiveness claims and whether Mr. Hill was entitled to the appointment of a different public defender.  Finding no *prima facie* case of ineffective assistance of counsel, the trial court denied Mr. Hill's request for another public defender.  (R. 184-85)  Mr. Hill decided to go *pro se* for the rest of the

-6-

proceedings. (R. Supp. 11)

A sentencing hearing was held on March 21, 2006. (R. Supp. 21-28) Based on Mr. Hill's criminal background, the trial court sentenced him as a Class X offender to 14 years of imprisonment.

Notice of appeal was filed on April 11, 2006. (C. 143)

## ARGUMENT

**Walter Hill Was Not Proven Guilty Beyond a Reasonable Doubt of Residential Burglary Where the Evidence of His Presence near the Residence Sometime Before the Burglary, and His Possession of a Few of the Stolen Goods Sometime after the Burglary, Did Not Prove That Mr. Hill Ever Actually Entered the Residence and Stole the Missing Items.**

In criminal prosecutions, the due process clause protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. U.S. CONST., amend. XIV; ILL. CONST., 1970, Art. 1, § 2; *In Re Winship*, 397 U.S. 358, 361-64 (1970). The State has the burden of proving beyond a reasonable doubt all of the material and essential facts constituting the crime charged. *People v. Weinstein*, 35 Ill. 2d 467, 220 N.E.2d 432 (1996). This burden never shifts to the accused. *Id.* In this case, in order to prove the offense of residential burglary, the State was required to prove that Walter Hill knowingly and without authority entered Robert Bily's house with the intent to commit a theft therein.[1] 720 ILCS 5/19-3(a)(2004). However, the presented evidence, which was all circumstantial in nature, did not establish that Mr. Hill ever entered Mr. Bily's house and took the missing items. Therefore, Mr. Hill's conviction for residential burglary must be reversed.

The applicable standard of review is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Young*, 128 Ill. 2d 1, 538 N.E.2d 453 (1989); *Jackson v. Virginia*, 443 U.S. 307 (1979). If, after such consideration, this Court is of the opinion that the evidence is not sufficient to remove all

---

[1] Kathleen Bily, Robert's wife, testified at trial rather than Robert. However, the information lists Robert Bily as the owner of the residence. (C. 10)

reasonable doubt of the defendant's guilt and is not sufficient to create an abiding conviction that he is guilty of the crime charged, then the conviction must be reversed. *People v. Bartall*, 98 Ill. 2d 294, 306, 456 N.E.2d 59 (1983); *People v. Jefferson*, 24 Ill. 2d 398, 402, 182 N.E.2d 1 (1962).

In this case, the State charged Mr. Hill with residential burglary despite having no evidence to prove that he was the individual who broke into the Bily's house. The only evidence presented was the testimony of Mrs. Bily that Mr. Hill was standing outside of the Bily home some time before the burglary occurred, and evidence that Mr. Hill sold some of the items reportedly stolen from the house sometime after the burglary. Based solely on Mr. Hill's presence on the scene, and his "recent, unexplained possession" of some of the proceeds, the trial court inferred Mr. Hill's guilt. (R. 135) However, this circumstantial evidence was insufficient proof that Mr. Hill was the person who entered the Bily's home and stole their possessions.

Mrs. Bily's observation of Mr. Hill near her home the morning of the burglary does not prove Mr. Hill's guilt. Mrs. Bily testified that as she was leaving for work that morning with her husband, at around 8:30 a.m., she saw Mr. Hill standing by the light post near her driveway, looking at her house. (R. 82) According to Mrs. Bily, Mr. Hill stayed by the light post as she backed her car down the driveway and drove away.[2] (R. 85) While Mrs. Bily originally said that Mr. Hill was standing on their lawn, she explained that there is no sidewalk on her block, and Mr. Hill was standing on the part of the grass where a sidewalk would typically be located. (R. 97) Mrs. Bily admitted that she never saw Mr. Hill enter the house, and in fact, she never even saw Mr. Hill

---

[2] At the preliminary hearing, Mr. Bily testified that when he was leaving the house that morning with his wife, he noticed a man *walking past* the driveway. (R. 32)

*approach* the house - she just saw him standing where a sidewalk should be. (R. 100)

With Mrs. Bily's testimony, the State established nothing more than Mr. Hill's presence in the vicinity of the house sometime before the burglary. A defendant's mere presence at the scene of a crime, even coupled with flight, is insufficient to prove guilt. *People v. Jones*, 278 Ill. App. 3d 790, 793, 663 N.E.2d 461 (3rd Dist. 1996); *People v. Mitchell*, 59 Ill. App. 3d 367, 369, 375 N.E.2d 531 (1st Dist. 1978). *See also People v. Bean and Wilkinson*, 121 Ill. App. 2d 290, 296, 257 N.E.2d 558 (1st Dist. 1970) (because of the presumption of innocence, a defendant need not explain his presence in the vicinity where a burglary occurred).

In *Mitchell*, the police detained the defendant as he was fleeing the area of an apartment building where a resident reported hearing someone trying to break into his apartment. 59 Ill. App. 3d at 368-69. The *Mitchell* Court overturned the conviction for criminal damage to property because the evidence only established that the defendant was present at the scene. *Id.* at 369. The Court said that the evidence showed that the defendant was probably the person who damaged the door, but that his guilt was not established beyond a reasonable doubt. *Id.* at 369-70. The Court held, "Mere presence at the scene of an offense and flight therefrom do not, of themselves, establish guilt. Although of probative value, suspicious circumstances cannot suffice as proof of an offense and will not sustain a conviction. The circumstantial evidence that supports a conviction must produce a reasonable and moral certainty that the accused committed the offense." *Id.* at 369 (citations omitted).

Here, the circumstances are even less suspicious than in *Mitchell* because Mr. Hill did not flee even when Mr. and Mrs. Bily exited their house and drove their car right in front of Mr. Hill. In fact, Mrs. Bily testified that as she backed out of the driveway,

Mr. Hill was facing her. (R. 100) Obviously, if Mr. Hill had been planning on doing something illegal, he would have tried to conceal himself or act as if he was just walking past; instead, he remained standing in the same spot.

Aside from Mr. Hill's presence near the Bily's home that morning, the only other evidence the State presented was that Mr. Hill sold two of the stolen goods to a pawn shop some time after the burglary. However, this evidence is also insufficient to prove Mr. Hill guilty of residential burglary.

A defendant's possession of recently stolen property, standing alone, is not sufficient evidence to sustain a burglary conviction. *People v. Natal*, 368 Ill. App. 3d 262, 2006 Ill. App. LEXIS 1053, *12 (No. 1-05-1643 November 20, 2006), *citing People v. Housby*, 84 Ill. 2d 415, 420 N.E. 2d 151 (1981). In *People v. Housby*, the Illinois Supreme Court reviewed the constitutionality of the presumption that an individual in possession of recently stolen property is the one who committed the burglary. 84 Ill. 2d at 424. The *Housby* Court concluded that a fact-finder could presume guilt based on exclusive possession of recently stolen property only if three requirements were met: (1) there was a rational connection between the defendant's recent possession of stolen property and his participation in the burglary; (2) the defendant's guilt of the burglary "more likely than not" flowed from his recent, unexplained and exclusive possession of the proceeds; and (3) there was corroborating evidence of the defendant's guilt. *Id.* The Court explained, "The person in exclusive possession may be the burglar, to be sure, but he might also be a receiver of stolen property, guilty of theft but not burglary, an innocent purchaser without knowledge that the item is stolen, or even an innocent victim of circumstances." *Id.* at 423.

In this case, the State failed to meet the three requirements set forth in *Housby*.

First, there was no rational connection between Mr. Hill's possession of the proceeds and the burglary. No eyewitness ever saw Mr. Hill inside the house. There was no evidence that Mr. Hill had ever been inside the Bily's house such as fingerprints, hairs, or other items left behind. *See People v. Johnson*, 96 Ill. App. 3d 1123, 1126, 422 N.E.2d 19 (2nd Dist. 1981) (where the Court found no rational connection between the defendant's possession of a small amount of miscellaneous items from a burglarized apartment to the burglary, where there was no evidence that the defendant had ever entered the apartment). Even if this Court finds a rational connection between Mr. Hill's possession of the stolen property and his participation in the burglary based on evidence that he was seen near the Bily sometime *before* the burglary, the evidence does not support a finding of either of the two other *Housby* requirements.

With respect to the second *Housby* requirement, there was no evidence that Mr. Hill's guilt "more likely than not" flowed from his possession of the proceeds. As explained above, it does not make sense that Mr. Hill would stand in front of the house that he intended to burgle as the occupants looked directly at him and drove right past him. More likely than not, the actual burglar hid or dropped the two heaviest or most cumbersome items and fled with the rest when Mr. Bily returned home. Then, Mr. Hill, who, as Mrs. Bily testified was in the neighborhood, came upon the hidden or discarded items and took them to be pawned.

Finally, with respect to the third *Housby* requirement, there was no corroborating evidence of Mr. Hill's guilt. He was never seen inside the house. Mrs. Bily admitted that she did not see Mr. Hill holding anything, such as tools or a duffel bag. (R. 99) When Mr. Hill was apprehended, he was not found in possession of any burglary tools, gloves, or weapons. He also did not possess any of the other missing proceeds, such as

-12-

the video games and accessories, or any of the several pieces of jewelry. In addition, no fingerprints or other forensic evidence were found in the house.

This Court's recent decision in *Natal* supports the reversal of Mr. Hill's conviction. In *Natal*, the complainant returned to his apartment to find evidence that his home had been ransacked, that his VCR and DVD player had been disconnected and moved, and that the patio door was open. 2006 Ill. App. LEXIS 1053 at *2. The complainant then observed the defendant standing 20 feet away from his apartment building, holding two pillowcases that had been removed from the complainant's bed. *Id.* at *3. When the complainant confronted the defendant, he stated, "It wasn't me. The guy just ran away." *Id.* As the defendant backed away from the complainant, dropping the pillowcases on the sidewalk, the complainant observed him remove a black item from his back pocket and drop it behind a dresser on display on the sidewalk in front of a furniture store. *Id.* at *4. When the police searched the defendant following his arrest, they found a padlock belonging to the complainant's girlfriend, which had been in the apartment. *Id.* The police also recovered the complainant's black glove from behind the dresser, which contained quarters and a gold necklace. *Id.* Fingerprints recovered from the apartment did not match the defendant's prints. *Id.* at *6. The Defendant explained that he had found the gold chain, locket, money, a glove and pillowcases on the sidewalk. *Id.*

This Court reversed the defendant's conviction, noting that the *Housby* test was not met. *Id.* at *13. In particular, this Court found that, although the facts could support a finding that there was a rational connection between the defendant's possession of the property and the burglary, based on his presence with the burglary items some 20 feet from the apartment building, the evidence did not support a finding that his guilt "more

-13-

likely than not" flowed from his recent possession of the stolen goods. *Id*. This Court found that the lack of a positive fingerprint match demonstrated a lack of corroborative evidence. *Id*. While this Court observed that the trial court found that the evidence of the defendant's hasty exit combined with his proximate presence near the crime scene supported a guilty finding, the appellate court rejected this conclusion, finding that the lack of a fingerprint match and lack of other corroborating evidence rendered it not unreasonable that someone else might have left the property behind. *Id*. at *16-17.

Similarly, in the present case, while there might have been a "rational connection" between Mr. Hill's possession of the stolen X-box and camcorder and the burglary of the Bily's house, the second two prongs of the *Housby* test were not met. Like the defendant in *Natal*, Mr. Hill was seen near the crime scene. In fact, Mr. Hill was seen some time *before* the burglary even occurred, and he did not try to flee or conceal himself, which is even less suspicious behavior than in *Natal*. Mr. Hill's fingerprints also were not found in the house. As in *Natal*, Mr. Hill was observed soon after the offense with a few of the stolen items. While the property that Mr. Hill sold at the pawn shop, the X-box and camcorder, were not of "minimal" value, it is equally likely that another person, in haste, dropped or hid those items in an attempt to avoid being discovered by Mr. Bily as he returned home.

As in *Natal*, this Court should find that, under these circumstances, Mr. Hill was not proven guilty of the offense. *See also People v. Ross*, 103 Ill. App. 3d 883, 885-87, 431 N.E.2d 1288 (1st Dist. 1981) (burglary conviction reversed where there was no evidence that defendant, who was found in possession of complainant's stereo in front of complainant's apartment building, ever entered the apartment or was in the building when the incident occurred, there was not a close relationship in time between the

-14-

burglary and his possession of the property, and it was not "more likely than not" that defendant's exclusive possession of the recently stolen property was the result of the burglary).

In conclusion, a defendant need not disprove his guilt. "An accused's right to demand proof of the State's case beyond a reasonable doubt is a protection of 'surpassing importance' [and] the fact that a defendant is 'probably' guilty' does not equate with guilt beyond a reasonable doubt." *People v. Ehlert*, 211 Ill. 2d 192, 212-13, 811 N.E. 2d 620 (2004). Thus, Mr. Hill's conviction, which was based solely on evidence that, at the most, proved only that it was *possible* that Mr. Hill committed the crime, cannot stand. Because the State failed to prove every material element of residential burglary beyond a reasonable doubt, this Court should reverse Mr. Hill's conviction, as well as the circuit court's order requiring him to submit blood specimens for genetic analysis. *See Natal*, 2006 Ill. App. LEXIS 1053 at *19 (because this Court reversed defendant's conviction, it also reversed circuit court's order requiring defendant to submit blood specimens for genetic analysis).

-15-

## CONCLUSION

For the foregoing reasons, Walter Hill, Defendant-Appellant, respectfully requests that this Court reverse his conviction for residential burglary, and reverse the circuit court's order requiring Mr. Hill to submit blood specimens for genetic analysis.


Respectfully submitted,


MICHAEL J. PELLETIER
Deputy Defender


PAMELA RUBEO
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois  60601
(312) 814-5472

COUNSEL FOR DEFENDANT-APPELLANT

-16-

## CERTIFICATE OF COMPLIANCE

I, Pamela Rubeo, certify that this brief conforms to the requirements of Supreme Court

Rule 341(a) and (b). The length of this brief, excluding the appendix is 17 pages.

PAMELA RUBEO
Assistant Appellate Defender

## APPENDIX TO THE BRIEF

Index to the Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Judgment Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-5

Notice of Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-6

## INDEX TO THE RECORD

**Common Law Record ("C")**                                                   **Page**

Memorandum of Orders ("Half Sheet") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C2

Arrest Report (November 3, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C5

Complaint for Preliminary Examination (Dated November 4, 2004) . . . . . . . . . . . . . . . . . . . C6

Information (Dated December 1, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C8

State's Motion for Discovery (December 20, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C12

Defendant's Motion for Discovery (December 20, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . C15

Petition for Substitution of Judge (December 20, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . C21

State's Answer to Discovery (January 31, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C23

*Pro Se* Petition for Writ of Habeas Corpus (April 7, 2005) . . . . . . . . . . . . . . . . . . . . . . . . C28

*Pro Se* Motion for Speedy Trial (April 7, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C34

Defendant's Answer to Discovery (June 6, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C39

Jury Waiver Form Signed (July 26, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C40

Motion for New Trial (August 23, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C41

*Pro Se* Motion for a New Trial Pursuant to 725 ILCS 5/116-1(August 25, 2005) . . . . . . . . C43

Presentence Investigation Report (August 25, 2005, March 21, 2006) . . . . . . . . . . . . C46, C105

*Pro Se* Defendant's Affidavit for Assignment of Counsel and Granting Leave to Appeal in
Forma Paperis (Dated August 15, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C81

*Pro Se* Petition for Appeal (September 9, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . C84, C91

*Pro Se* Motion for Bill of Particulars (Dated September 14, 2005) . . . . . . . . . . . C93, C95, C97

*Pro See* Memorandum of Law in Support of Motion for New Trial Pursuant to 725
ILCS 5/116-1(October 4, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C99

Sentencing Order (March 21, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C140

Order for Defendant to Submit Blood Specimens to the Illinois Department of State Police for
Genetic Analysis (March 21, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C141

Notice of Appeal (April 11, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C143

**Supplemental Common Law Record**

Exhibits ................................................................ 2

**Report of Proceedings ("R")**

| | Direct | Cross | Redir. | Recr. |
|---|---|---|---|---|
| November 23, 2004 - Preliminary Hearing | | | | |
| State Witnesses | | | | |
|     Kathleen Mary Bily | 18 | 21 | | |
|     Robert Bily | 28 | 32 | | |
|     Carlos Ortiz | 35 | 39 | | |
| Finding of Probable Cause | | | | 41 |
| December 20, 2004 - Continuance | | | | 44 |
| January 31, 2005 - Continuance | | | | 47 |
| March 9, 2005 - Status and Subpoenas Issued | | | | 50 |
| April 7, 2005 | | | | |
| Subpoenaed Materials Tendered to Public Defender | | | | 62 |
| *Pro Se* Motions Withdrawn | | | | 64 |
| May 9, 2005 - Continuance | | | | 67 |
| June 6, 2005 - Continuance | | | | 70 |
| July 26, 2005 | | | | |
| **Bench Trial** | | | | |
| Jury Waiver Signed | | | | 74 |
| Opening Statement | | | | |
|     Ms. Doyle | | | | 74 |
|     Mr. Rosenthal | | | | 79 |
| State Witnesses | | | | |
|     Kathleen Bily | 81 | 97 | | |

A-2

|  | **Direct** | **Cross** | **Redir.** | **Recr.** |
|---|---|---|---|---|
| Ray Tome | 104 | 114 | | |
| Carlos Ortiz | 116 | | | |

State Rests ... 130

Motion for Directed Finding - Denied ... 130

Defense Rests ... 130

Closing Arguments

    Mr. Serio ... 131

    Mr. Rosenthal ... 132

Finding of Guilt ... 135

August 25, 2005

Public Defender files Motion to Reconsider ... 139

Defendant Files Motion to Proceed *Pro Se* ... 141

Public Defender Granted Leave to Withdraw ... 142

Defendant Files Motion ... 142

September 16, 2005 - Continuance ... 148

October 4, 2005

Defendant Files Motion for Bill of Particulars ... 154

November 1, 2005 - Continuance ... 160

December 2, 2005 - Continuance ... 163

January 17, 2006 - Continuance ... 166

January 25, 2006

Motion on Trial Counsel's Ineffectiveness

State Witness

|  | **Direct** | **Cross** |  |  |
|---|---|---|---|---|
| Craig Rosenthal | 173 | 178 | | |

A-3

|  | **Direct** | **Cross** | **Redir.** | **Recr.** |
|---|---|---|---|---|
| Arguments |  |  |  |  |
| Mr. Clark |  |  |  | 183 |
| The Defendant |  |  |  | 183 |
| Court's Ruling |  |  |  | 184 |

**Supplemental Report of Proceedings (SR)**

| December 20, 2004 - Continuance |  |  |  | 8 |
|---|---|---|---|---|
| March 21, 2006 |  |  |  |  |
| Motion for New Trial - Denied |  |  |  | 21 |
| Sentencing Hearing |  |  |  |  |
| Argument in Aggravation |  |  |  | 22 |
| Argument in Mitigation |  |  |  | 24 |
| Imposition of Sentence |  |  |  | 26 |
| Appeal Rights |  |  |  | 27 |
| May 22, 2006 |  |  |  |  |
| Motion to Reconsider Sentence Stricken |  |  |  | 32 |

WALTER    L.HILL                            )            DATE OF ARREST  11/03/04
Defendant                                                IR NUMBER _____    SID NUMBER 28081320

### ORDER OF COMMITMENT AND SENTENCE TO
### ILLINOIS DEPARTMENT OF CORRECTIONS
================================================

The above named defendant having been adjudged guilty of the offense(s) enumerated below
is hereby sentenced to the Illinois Department of Corrections as follows:

| Count | Statutory Citation | Offense | Sentence | Class |
|---|---|---|---|---|
| 001 | 720-5/19-3(A) | RESIDENTIAL BURGLARY | YRS. 014  MOS.00 | 1 |

and said sentence shall run concurrent with count(s) ___ ___ ___ ___

_____    YRS. ____ MOS. ____
and said sentence shall run (concurrent with)(consecutive to) the sentence imposed on:

_____    YRS. ____ MOS. ____
and said sentence shall run (concurrent with)(consecutive to) the sentence imposed on:

_____    YRS. ____ MOS. ____
and said sentence shall run (concurrent with)(consecutive to) the sentence imposed on:

_____    YRS. ____ MOS. ____
and said sentence shall run (concurrent with)(consecutive to) the sentence imposed on:

On Count  1  defendant having been convicted of a class  X  offense is sentenced as
a class x offender pursuant TO 730 ILCS 5/5-5-3(C)(8).

On Count ___ defendant is sentenced to an extended term pursuant to 730 ILCS 5/5-8-2.

The Court finds that the defendant is entitled to receive credit for time actually served
in custody for a total credit of **504** days as of the date of this order

IT IS FURTHER ORDERED that the above sentence(s) be concurrent with
the sentence imposed in case number(s) _____
AND: consecutive to the sentence imposed under case number(s) _____

IT IS FURTHER ORDERED THAT _____

_____

IT IS FURTHER ORDERED that the Clerk provide the Sheriff of Cook County with a copy of this Order and that the Sheriff
take the defendant into custody and deliver him/her to the Illinois Department of Corrections and that the Department take
him/her into custody and confine him/her in a manner provided by law until the above sentence is fulfilled.

DATED    MARCH 21, 2006                      ENTER: 03/21/06

CERTIFIED BY  D DIANA MANDARINO
              DEPUTY CLERK                   JUDGE: TUCKER, THOMAS M.          1550
NWP3 03/21/06 11:30:54                                                       CCG N305

C000140

IN THE CIRCUIT COURT OF COOK COUNTY

CRIMINAL DIVISION

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | IND./INF. No. 04 C4 41169 |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | Trial Judge: Thomas M. Tucker |
| -vs- | ) | |
| | ) | Trial Atty: |
| HILL, WALTER | ) | |
| | ) | Type of Trial: |
| Defendant-Appellant. | ) | |

## NOTICE OF APPEAL

An appeal is taken to the Appellate Court, First District:

Appellant(s) Name:          Walter Hill    B-58710

Appellant's Address:        Illinois Department of Corrections

Appellant(s) Attorney:      Office of the State Appellate Defender

Address:                    203 North LaSalle Street - 24th Floor
                            Chicago, Illinois  60601

Offense of which convicted: Residential Burglary

Date of Judgment or Order:  March 21, 2006

Sentence:

If appeal is not from a conviction, nature of order appealed:

_Michael J. Pelletier_

MICHAEL J. PELLETIER
Deputy Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois  60601
(312) 814-5472
COUNSEL FOR DEFENDANT-APPELLANT

FILED - 4
CLERK OF THE CIRCUIT COURT
DOROTHY BROWN CLERK
2006 APR 11  AM 10: 38

C000143

NO. 06-0928

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

---

PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

vs.

WALTER HILL,

Defendant-Appellant.

---

Appeal from the Circuit Court of Cook County, Criminal Division.
Honorable **THOMAS M. TUCKER**, Judge Presiding.

BRIEF AND ARGUMENT FOR
PLAINTIFF-APPELLEE

———

RICHARD A. DEVINE,
State's Attorney,
County of Cook,
Room 309 - Richard J. Daley Center,
Chicago, Illinois 60602

<u>Attorney for Plaintiff-Appellee</u>

JAMES E. FITZGERALD,
JOHN E. NOWAK,
ORION N. ARTIS,
Assistant State's Attorneys,
   <u>Of Counsel</u>.

EXHIBIT D

Kh42

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

PEOPLE OF THE STATE OF ILLINOIS,

                                        Plaintiff-Appellee,

                            vs.

WALTER HILL,

                                        Defendant-Appellant.

## POINT AND AUTHORITIES

**DEFENDANT WAS PROVED GUILTY BEYOND A REASONABLE DOUBT OF RESIDENTIAL BURGLARY WHERE THE EVIDENCE PROVIDED FOR THE INFERENCE THAT DEFENDANT ENTERED THE PROPERTY AFTER HE WAS SEEN ON THE SCENE AND LATER SOLD PROPERTY FROM THE RESIDENCE TO A PAWN SHOP**.............. 7

*Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979)............................ 7

*People v. Collins*, 106 Ill. 2d 237 (1985)............................................. 7, 10

*People v. Sutherland*, 155 Ill. 2d 1 (1992)........................................ 7

*People v. Campbell*, 146 Ill. 2d 363 (1992).................................... 7, 8

*People v. Bull*, 185 Ill. 2d 179 (1998)............................................. 7-8

*People v. Patterson*, 217 Ill. 2d 407 (2005).................................... 8

*People v. Cathers*, 194 Ill. App. 3d 318 (4th Dist. 1989) ............................ 9

*People v. Mitchell*, 59 Ill. App. 3d 367 (1st Dist. 1978) ................................. 9, 11

*People v. Curtis*, 45 Ill. App. 3d at 774 (4th Dist. 1977) ............................... 9

*People v. Magnafichi*, 9 Ill 2d 169 (1956) ...................................................... 9, 10

*People v. Pintos*, 133 Ill. 2d 286 (1989) ........................................................ 10

*People v. Natal*, 368 Ill. App. 3d 262 (1st Dist. 2006) .................................. 11, 12

## ISSUE PRESENTED FOR REVIEW

Whether after viewing the evidence in a light most favorable to the People defendant was proven guilty beyond a reasonable doubt of residential burglary where the evidence demonstrated that defendant was on the property of the burglarized home before the burglary and shortly thereafter defendant sold property stolen from the home to a pawn shop.

## STATEMENT OF FACTS

By information defendant Walter Hill was charged with residential burglary relating to a burglary that occurred on October 30, 2005, at 437 Haber, North Lake, IL. (CLR. 9-11). After a bench trial in which the court heard testimony from three witnesses, the Honorable Thomas M. Tucker found defendant guilty of residential burglary. (R. 135). Defendant was sentenced to 14 years in the Illinois Department of Corrections. (Supp. R. 27).

On October 30, 2005 at approximately 8:30 a.m., Kathleen Bily and her husband exited their home at 437 Haber, North Lake, IL. (R. 18). As Mrs. Bily backed out of her driveway, she noticed defendant standing stationary on her property looking toward her home. (R. 83). Mrs. Bily believed defendant presence was strange because of the early hour and she did not recognize him from the neighborhood, and she had lived at her residence for 15 years. (R. 82-83). As Mrs. Bily backed out of her driveway, she turned in her seat so that she could look through her rear widow. (R. H83). While driving in reverse, Mrs. Bily was able to observe defendant through her rearview mirror for approximately 30 seconds. (R. 102). Defendant was standing stationary on Mrs. Bily's lawn near a street lamp post on the

3

left side of the driveway. (R. 82-83). As Mrs. Bily passed defendant, defendant stood approximately 5 feet away. (R. 85). During a preliminary hearing, Mr. Bily testified that he observed defendant walking past their driveway. (R. 32). After passing by defendant, Mrs. Bily performed a three-point turn to enter the roadway; at this time defendant stood parallel to Mrs. Bily on the driver's side of her vehicle. (R. 86). Mrs. Bily and her husband then proceeded to work. (R.88).

After arriving at work, Mrs. Bily received a call from her husband requiring her to return home. Upon her arrival home, Mrs. Bily found her jewelry box dumped out, dresser drawers pulled out and items missing from her home. (R. 89). Thereafter the Bily's contacted police and presented serial numbers for a stolen Xbox and Sony Camcorder. (R. 38).

On November 3, 2005, Corporal Carlos Ortiz of the Lakeview Police Department investigated the burglary of Mrs. Bily's home; on this day, Corporal Ortiz visited Village Jewelry and Loan. (R. 117, 118). While at Village Jewelry and Loan, Corporal Ortiz spoke with Ray Tome, an employee of Village Jewelry and Loan. (R. 118). Corporal Ortiz presented Mr. Tome with serial numbers corresponding to the missing items. (R. 117). Mr. Tome searched his database and learned that the missing property was in possession of the pawn shop. (R.111). Mr. Tome informed Corporal Ortiz of the presence of the items and showed Corporal Ortiz a signed bill of sale. (R. 37). The bill of sale included defendant's name and signature, serial numbers for the items purchased (Xbox and a Sony Camcorder with accessories), and the time (10:15 am), date (10/30/2005), and amount paid to defendant

4

for the item ($100). (R. 108-12, 118).

Next, while preparing a patrol bulletin at the police station, Corporal Ortiz learned that defendant was presently in police custody for an unrelated matter. (R. 123). Subsequently, Corporal Ortiz prepared defendant for two physical line-up identifications. (R. 127). The line-up included the defendant standing side by side with five men. (R. 93). Mrs. Bily positively identified defendant as the individual they saw standing in on her lawn on the morning to the burglary. ( R. 92-95, 125). Mr. Tome positively identified defendant in a separate line-up as the individual who sold the items to Village Jewelry and Loan. (R. 113).

At the close of the People's case-in-chief, defendant made a motion for directed verdict without presenting an argument. (R. 130). Defendant's motion was denied. (R. 130). Defendant rested his case without presenting any evidence. In closing defendant argued that the People failed to present "affirmative evidence that defendant entered the residence" as required by the charging statute. (R. 133). In response, the court inquired about defendant's unexplained possession of stolen property to which defense counsel responded, "I think this case would be different had he been charged with theft." (R. 133). After consideration of the evidence the court stated:

> I find the testimony of the two civilian witnesses credible in its
> identification of defendant as the person, number one, who was at
> the scene of the residential burglary and, number two, as the person
> who in fact did sell the items within an hour or two of the
> residential burglary. So the – I have sufficient evidence to support

5

the identifications of the defendant. (R. 135). Further, I find that the recent, unexplained possession of stolen property, while alone by itself would not be sufficient to support residential burglary, the fact that recent, unexplained possession is -- has been proven beyond a reasonable doubt and been corroborated by the credible identification of the defendant as the person who was at the scene of the residential burglary. I find that with all that there is sufficient evidence for a finding of guilty as to residential burglary. (R. 135)

Subsequently the court imposed a Class X sentence of 14 years imprisonment with 3 years mandatory supervision upon release. (Supp. R. 27).

Defendant now appeals his conviction

6

## ARGUMENT

**DEFENDANT WAS PROVED GUILTY BEYOND A REASONABLE DOUBT OF RESIDENTIAL BURGLARY WHERE THE EVIDENCE PROVIDED FOR THE INFERENCE THAT DEFENDANT ENTERED THE PROPERTY AFTER HE WAS SEEN ON THE SCENE AND LATER SOLD PROPERTY FROM THE RESIDENCE TO A PAWN SHOP.**

Defendant contends that he was not proved guilty beyond a reasonable residential burglary. However, the evidence demonstrates defendant was on the property before the burglary and within an hour of the burglary defendant sold the stolen property to a pawn shop. For these reasons, a rational trier of fact found defendant guilty beyond a reasonable doubt.

When a defendant challenges the sufficiency of the evidence, the appellate court must decide whether, after considering all of the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979) (emphasis in original) *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The reviewing court must apply this standard regardless of whether the evidence is direct or circumstantial. *People v. Sutherland*, 155 Ill. 2d 1, 17 (1992). The court will not substitute its judgment for that of the trier of fact on the questions involving the weight of the evidence, credibility of witnesses, or resolution of conflicting testimony. *People v. Campbell*, 146 Ill. 2d 363, 375 (1992). When weighing the evidence, the trier of fact "is not required to disregard inferences that flow from the evidence, nor is it required to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Bull*, 185

7

Ill. 2d 179, 205 (1998). Ultimately, a conviction will not be set aside unless the evidence is so palpably contrary to the verdict, or so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of guilt. *Campbell*, 146 Ill. 2d at 375.

In Illinois, a person commits residential burglary, Section 5/19-3 (West 1992), "when he enters or knowingly and without authority remains within the dwelling place of another, or .... with the intent to commit ... theft." Due to the nature of the offense, proof of defendant's unauthorized entry and intent to commit theft must be demonstrated by circumstantial evidence. Circumstantial evidence is the proof of facts or circumstances which gives rise to **a reasonable inference of other facts** which tend to establish the guilt or innocence of a defendant. Ill. Pattern Jury Instructions Criminal No. 3.02. A conviction may be based solely on circumstantial evidence. *People v. Patterson*, 217 Ill. 2d 407, 435 (2005).

In this case, when viewing the evidence in the light most favorable to the People, it is clear that there is substantial evidence for a rational trier of fact to conclude that defendant entered the Bily's residence without authorization and committed theft. To establish that defendant entered the Bily's residence the People demonstrated that defendant was present on the property directly before the burglary, and 90 minutes later defendant was in exclusive possession of property stolen from the residence. (R. 82, 112). Further, testimony showed that defendant was unknown to the victim's prior to the burglary and was not granted permission to enter the residence or remove property. (R. 84). Although there is no direct evidence that defendant entered the residence, that is that no one saw him inside, when viewed together all of the facts provide for the inference that defendant entered the property

8

and removed the items. For instance, in *People v. Cathers*, 194 Ill. App. 3d 318 (4th Dist. 1989) there was limited evidence of defendant's entry into the residence however, defendant's sale of the property to a business within 24 hours of the burglary supported the inference that defendant entered the residence and committed residential burglary. *Id.* at 323. In *Cathers*, despite statements made by a co-defendant implicating the defendant, the court stated "[e]ven in the absence of the statement made by Michael, the defendant's guilt was proved beyond a reasonable doubt." *Id.* at 323.

Defendant contends that the People's evidence did not prove him guilty of residential burglary because the evidence did not demonstrate that he entered the residence. (Deft. Br. 8-15). Specifically, defendant argues that the People's evidence proved defendant's mere presence at the crime scene, and that mere presence even couple with flight, is insufficient to prove guilt. (Deft. Br. 10). Defendant relies on *People v. Mitchell*, 59 Ill. App. 3d 367 (1st Dist. 1978) (Deft. Br. 10), but *Michell* is easily distinguishable for two reasons. First, *Mitchell* is no longer good law since it reversed the defendant's conviction by relying on the heightened, and now defunct, standard of review for cases based on circumstantial evidence, the "reasonable hypothesis of innocence standard." The *Mitchell* court stated that "circumstantial evidence which supports a conviction must produce a reasonable and moral certainty that the accused committed the offense." *Mitchell*, 59 Ill. App. 3d at 369 (*citing People v. Curtis*, 45 Ill. App. 3d at 774 (4th Dist. 1977)). The *Curtis* case used the same language and cited to *People v. Magnafichi*, 9 Ill 2d 169 (1956), as support. *Curtis*, 45 Ill. App. 3d at 744. The court in *Magnafichi* used this same language regarding circumstantial

9

evidence, and explained that "[w]here the circumstances can be explained upon a reasonable hypothesis consistent with innocence and leave a serious and grave doubt of guilt, a conviction can not stand." *Magnafichi*, 9 Ill. 2d. at 173. In *People v. Pintos*, however, the Illinois Supreme Court emphatically rejected the "reasonable hypothesis of innocence" standard that Illinois courts had used when reviewing convictions based on circumstantial evidence. *People v. Pintos*, 133 Ill. 2d 286, 291 (1989) (explaining that "the reasonable hypothesis of innocence standard of review is no longer viable in Illinois"). Instead, the supreme court explained that "the reasonable doubt test as set fourth in *People v. Collins*, 106 Ill. 2d 237, 261 (1985), should be applied in reviewing the sufficiency of evidence in all criminal cases, whether the evidence is direct or circumstantial." *Pintos*, 133 Ill. 2d at 291. That standard, of course, is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the a crime beyond a reasonable doubt." *Collins*, 106 Ill. 2d at 261 (quoting *Jackson*, 443 U.S. at 307) (emphasis in original). As a result, *Mitchell* does not apply here since it used the now rejected "reasonable hypothesis of innocence" standard in reversing the defendant's conviction.

Second, *Mitchell* would be distinguishable even if the court had applied the current standard of review set forth in *Jackson* and *Collins*. Defendant's argument fails to account for the great factually disparity between the instant matter and *Mitchell*. The only evidence in *Mitchell* that linked the defendant to the crime scene was he was observed leaving a building where someone attempted to pry a door open; defendant was not observed near the

10

damaged door nor was he found with any object in his possession which could have produced such damage. *Mitchell*, 59 Ill. App. at 369. Here, the burglarized residence is a single family dwelling, not an apartment building. Further, defendant's presence on the property is not attributed to him walking past the house, Ms. Bily testified that defendant stood on the property as she exited her home, locked the door, walked to her car, entered the vehicle and began to reverse out of the driveway. Also Ms. Bily gave defendant plenty of time to pass her drive way but he remained stationary. (R. 84). Defendant had ample time to cross from where he stood to the other side of the driveway. (R. 82, 99-100). Also, defendant was observed on the property empty handed moments before the burglary and 90 minutes later defendant sold property from the residence to a pawn shop. (R. 30, These facts inescapably tether defendant to this crime unlike *Mitchell* who was only observed at the scene.

Next, defendant argues that defendant's unexplained possession of recently stolen property is insufficient to link him to the burglary and a finding of guilt. In support of this position defendant cites *People v. Natal*, 368 Ill. App. 3d 262 (1st Dist. 2006). Again, defendant's legal authority is not factually analogous to the instant matter. In *Natal*, the defendant was seen standing twenty feet from the burglarized residence with stolen property from the residence. *Id.* at 264. After being approached by the victim the defendant informed the victim that he happened upon the items after seeing the perpetrator drop the items. *Id.* at 264. The court found that besides being in possession of stolen property no other evidence corroborated that defendant entered the residence. *Id.* at 269. Additionally, finger prints were

11

recovered from items the burglar handled, however **these prints did not match the defendant**. *Id.* at 270 (emphasis added). These details weighed in favor of the defendant's innocence rather than proved his guilt. The court in *Natal* stated, "when that evidence is considered with the evidence that the fingerprints did not match those of defendant, there is no corroborating evidence to support a finding that defendant's possession of the stolen property was sufficient to convict defendant beyond a reasonable doubt. It is not incredible that the property left behind, which was of minimal value, was left by someone else who burglarized Fuentes' apartment." *Id. at 270.* In this case, no factual circumstances exist to indicate that someone else committed this burglary; no fingerprints were recovered suggesting another perpetrator as in *Natal*. Further, defendant's presence can not be explained as happenstance as in *Natal*. In *Natal*, the defendant was observed standing on a busy sidewalk at noon in a commercial district. *Id.* at 264, 265. In this case, defendant was seen standing alone at 8:30 am on a residential property. (R. 82). Additionally, defendant was a stranger to the neighborhood, Mrs. Bily testified that she had never seen defendant in the 15 years of her living at the residence. (R. 82). This detail is significant in that the residence is located on a dead end street, presumably this street would have less thruway traffic. Therefore, in 15 years Mrs. Bily would become familiar with neighbors. (R. 82). The above distinctions between *Natal* and the present case demonstrates the inapplicability of *Natal*, the evidence in *Natal* corroborated the defendant's innocence where here, each detail inculpates defendant.

12

In support of the above argument defendant cites also *Housby*, 84 Ill. 2d at 415. Defendant argues that as per *Housby*, the People did not satisfy the test for dealing with a permissive presumptions; the *Housby* court concluded that evidence beside a defendant's exclusive and unexplained possession of recently stolen property is necessary for a finding of guilt. *Id.* at 423. In addition to exclusive unexplained possession, the evidence must demonstrate: (1) a rational connection between the defendant's recent possession of stolen property and his participation in the burglary; (2) the defendant's guilt of the burglary "more likely than not" flowed from his recent, unexplained and exclusive possession of the proceeds; and (3) there was corroborating evidence of defendants guilt. *Id.* at 42. Despite defendant argument, the evidence fully supported the above presumption test. *Id.* at 270.

First, a rational connection between the defendant's recent possession of stolen property and his participation in the burglary is established by the proximity of time between the time he was seen near the home, the time of the burglary, and the time he sold the stolen items, a difference of 90 minutes. (R, 82, 109). Next, the following circumstances in evidence, taken together, establish that it is more likely than not that defendant obtained possession of the recently stolen property by burglary. *Housby*, 84 Ill. at 425. Defendant was observed watching the Bily's exit from the rear of their home; defendant was on the property after the Bily's left their home, entered the Bily by a rear widow adjacent to the rear door, and defendant was in exclusive possession of stolen property within 90 minutes after being seen at that the scene. (R. 82,106, 118). These circumstances make it unlikely that defendant was an innocent victim of circumstances. Finally, the inference that defendant entered the

13

Bily home and committed theft is corroborated by independent identifications of defendant by Mrs. Bily and Mr. Tome. (R. 127-29). Mrs. Bily observed defendant on the property as she left her home and Mr. Tome purchased the Bily's property from defendant 90 minutes after the Bily's left their home. (R.82). Based on these facts a rational trier of fact reasonably inferred that defendant entered the property and committed theft, especially when the evidence is viewed in the light most favorable to the prosecution.

In closing, this case does not hinge solely on defendant's unexplained possession of recently stolen property nor solely on his mere presence in the vicinity. The totality of all the facts establish defendant's guilt beyond a reasonable doubt. Defendant was present on the property before the burglary, he observed the residents leave their home, and 90 minutes later he sold their property to a pawn shop. After considering all of the evidence in the light most favorable to the prosecution, a rational trier of fact could have found, and did find, all of the essential elements of the crime beyond a reasonable doubt.

14

br

## CONCLUSION

The People of the State of Illinois respectfully request that this Honorable Court affirm defendant's conviction for residential burglary.

Pursuant to *People v. Nicholls*, 71 Ill. 2d 166, 374 N.E.2d 194 (1978) and relevant statutory provisions 725 ILCS 5/110-7(h)(2004); 725 ILCS 130/13 (2004); 55 ILCS 5/4-2002.1 (2004), the People of the State of Illinois respectfully request that this Court grant the People costs and incorporate as part of its judgment and mandate a fee of $100.00 for defending this appeal. In addition, pursuant to *People v. Agnew*, 105 Ill. 2d 275, 473 N.E.2d 1319 (1985) and 55 ILCS 5/4-2002.1 (2004), the People respectfully request that this Court also grant the People an additional fee of $50.00 in the event oral argument is held in this case.

Respectfully Submitted,

RICHARD A. DEVINE,
State's Attorney,
County of Cook,
Room 309 - Richard J. Daley Center,
Chicago, Illinois 60602

Attorney for Plaintiff-Appellee

JAMES E. FITZGERALD,
JOHN E. NOWAK,
ORION N. ARTIS,
Assistant State's Attorneys,
   Of Counsel.

## CERTIFICATE OF COMPLIANCE

I certify that this brief conforms to the requirements of Supreme Court Rules 341(a)

and (b). The length of this brief is 15 pages.

BY: _____

Orion N. Artis,
Assistant State's Attorneys,

No. 1-06-0928

**IN THE**

**APPELLATE COURT OF ILLINOIS**

**FIRST DISTRICT**

APR 2 0 2007

| | | |
|---|---|---|
| **PEOPLE OF THE STATE OF ILLINOIS,** | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| -vs- | ) | No. 04 C4 41169. |
| | ) | |
| **WALTER HILL,** | ) | Honorable |
| | ) | Thomas M. Tucker, |
| Defendant-Appellant. | ) | Judge Presiding. |

---

**REPLY BRIEF AND ARGUMENT FOR DEFENDANT-APPELLANT**

---

MICHAEL J. PELLETIER
Deputy Defender

PAMELA RUBEO
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois 60601
(312) 814-5472

COUNSEL FOR DEFENDANT-APPELLANT

EXHIBIT E

No. 1-06-0928

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| -vs- | ) | No. 04 C4 41169. |
| | ) | |
| WALTER HILL, | ) | Honorable |
| | ) | Thomas M. Tucker, |
| Defendant-Appellant. | ) | Judge Presiding. |

## REPLY BRIEF AND ARGUMENT FOR DEFENDANT-APPELLANT

**Walter Hill Was Not Proven Guilty Beyond a Reasonable Doubt of Residential Burglary Where the Evidence of His Presence near the Residence Sometime Before the Burglary, and His Possession of a Few of the Stolen Goods Sometime after the Burglary, Did Not Prove That Mr. Hill Ever Actually Entered the Residence and Stole the Missing Items.**

The State concedes that there was no direct evidence to prove that Walter Hill committed the residential burglary, but the State defends the validity of Walter Hill's presumed guilt based on his presence at the scene sometime before the burglary, and his possession of some of the stolen property sometime after the burglary. (St. Br. 7-8) Contrary to the State's arguments, Mr. Hill's conviction should be reversed where the trial court's presumption of his guilt was invalid and insufficient to find him guilty of residential burglary beyond a reasonable doubt.

The State's comparison of the minimal circumstantial evidence in this case to that in *People v. Cathers*, 194 Ill. App. 3d 318, 550 N.E.2d 1018 (4th Dist. 1989), is

-1-

unavailing. (St. Br. 9) At the outset, it must be noted that in *Cathers*, the defendant did not raise a reasonable doubt argument, but contested the admission into evidence of his brother's inculpatory statement. 194 Ill. App. 3d at 320-21. The Fourth District Appellate Court rejected Cathers' argument because nothing in the record indicated that the trial court considered his brother's statement against the defendant. *Cathers*, 194 Ill. App. 3d at 322. The appellate court reached that conclusion, even though the trial court did not explicitly indicate that it was not considering the brother's statement against Cathers, because all of the other evidence aside from that statement supported a finding of guilt. Since the *Cathers* court's comments were in the context of a completely different issue concerning an evidentiary question, it is inapplicable to the case at hand. This is especially true given the fact that the court reviewed only the facts that were necessary to that disposition. *Id.* at 320.

Even if the *Cathers* decision is relevant to this case, the evidence presented at that trial was much stronger than that presented against Mr. Hill. While Cathers and Mr. Hill were both found to have pawned some stolen items within 24 hours after the burglaries, the evidence tying Cathers to the victims and their house was much stronger. In fact, Cathers was acquainted with the victim's house, as he had been in the house several times before. *Cathers*, 194 Ill. App. 3d at 322. Here, in contrast, both victims testified that they did not know Mr. Hill and that he had never before been in their residence. (R. 27, R. 82) Also, in *Cathers*, the only item stolen from the victims' home was the VCR that Cathers had pawned, whereas in the case at hand, there were several items taken from the Bily's home that were never connected to Mr. Hill and remained unaccounted for. The facts in this case make it entirely possible that Mr. Hill happened upon some discarded or hidden items that he sold, while the facts in *Cathers* make such

-2-

a scenario impossible. Thus, this case is distinguishable from *Cathers* and more in line with *People v. Mitchell*, 59 Ill. App. 3d 367, 375 N.E.2d 531 (1978), and *People v. Natal*, 368 Ill. App. 3d 262 (1st Dist. 2006).

The State attempts to distinguish *Mitchell* because that case used the reasonable hypothesis of innocence standard of review. (St. Br. 9) Under that standard, a circumstantial evidence case had to preclude every reasonable hypothesis of innocence in order to sustain a conviction. *People v. Lewellen*, 43 Ill. 2d 74, 78, 250 N.E.2d 651, 654 (1969). The reasonable hypothesis of innocence standard was rejected by the Illinois Supreme Court in favor of a uniform standard of review. *People v. Pintos*, 133 Ill. 2d 286, 291, 549 N.E.2d 344, 346 (1989). As a result, the law in Illinois applies the same standard of review for all criminal cases whether they present circumstantial or direct evidence. *Id.* at 291.

Mr. Hill is well aware of the standard of review and clearly states the appropriate standard of review in his opening brief. (Def. Br. 8-9) The only standard of review that Mr. Hill is arguing is whether, viewing the evidence in a light most favorable to the State, a rational trier of fact could have found all of the essential elements of the offense. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), (Def. Br. 8-9).

Mr. Hill does not cite *Mitchell* in terms of the standard of review, but for the proposition that "mere presence at a crime scene and flight therefrom does not establish guilt." *Mitchell*, 59 Ill. App. 3d at 369. This proposition is still good law. Mr. Hill also quoted certain language from *Mitchell*, i.e., that "circumstantial evidence which supports a conviction must produce a reasonable and moral certainty that the accused committed the offense." *Id.* No court has directly overruled this language. But, even if this

-3-

language is no longer valid law, it does not change the outcome of this case, because Mr. Hill is not advocating a different standard of review. Mr. Hill is citing *Mitchell* in support of his argument that the mere presence at a crime scene is not enough to support a conviction.

The State claims that *Mitchell* is distinguishable because of its factual disparity. While *Mitchell* and this case differ in that the alleged offenses and their surrounding circumstances vary, they are similar in one very important aspect - both defendants were merely present at the scene of the crime. And, as this Court held in *Mitchell*, mere presence at the scene of an offense is not enough to establish guilt. 59 Ill. App. 3d at 368-69. Mr. Hill stands on the detailed argument in his opening brief applying the *Mitchell* holding to the case at hand. (Def. Br. 10-11)

The State's attempt to discredit the application of *Natal* is similarly unavailing. Mr. Hill relies on the argument in his opening brief comparing the facts of this case to *Natal*, in which this Court reversed the defendant's burglary conviction based on a lack of evidence, even when the facts of *Natal* were more suspicious than in the case at hand. (Def. Br. 13-14) As for the State's argument that the *Natal* facts weighed more in that defendant's favor because another person's fingerprints were found on the burgled items, whereas "no factual circumstances exist to indicate that someone else committed this burglary" (St. Br. 12), Mr. Hill would like to point out that requiring him to provide such exculpatory evidence would improperly shift the burden of proof to the accused, when that burden must instead remain the responsibility of the prosecution. *People v. Weinstein*, 35 Ill. 2d 467, 220 N.E.2d 432 (1996). If a conviction is to be sustained, it must rest on the strength of the State's case and not on the weakness of the defendant's. *People v. Coulson*, 13 Ill. 2d 290, 149 N.E.2d 96 (1958). As a final matter, Mr. Hill

would like to point out that while no fingerprints tied another person to this burglary, there were also no fingerprints tying Mr. Hill to the burglary either. *See Mitchell*, 59 Ill. App. 3d at 369 (in determining weakness of State's case, this Court considered fact that screwdriver found at scene of crime was never tested for fingerprints, and therefore defendant was never connected to that object).

     In conclusion, Mr. Hill relies on the complete argument in his opening brief that his residential burglary conviction must be reversed because the State failed to prove beyond a reasonable doubt that Mr. Hill ever entered the Bily's house and took the missing items.

## CONCLUSION

For the foregoing reasons, Walter Hill, Defendant-Appellant, respectfully requests that this Court reverse his conviction for residential burglary, and reverse the circuit court's order requiring Mr. Hill to submit blood specimens for genetic analysis.

Respectfully submitted,

MICHAEL J. PELLETIER
Deputy Defender

PAMELA RUBEO
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois 60601
(312) 814-5472

COUNSEL FOR DEFENDANT-APPELLANT

CERTIFICATE OF COMPLIANCE

I, Pamela Rubeo, certify that this brief conforms to the requirements of Supreme Court

Rule 341(a) and (b).  The length of this brief, excluding the appendix is six pages.

PAMELA RUBEO
Assistant Appellate Defender

# 1 0 5 6 8 6

NO. _____

IN THE

## SUPREME COURT OF ILLINOIS

| | | |
|---|---|---|
| People State of Illinois, | ) | Appellate Court, |
| | ) | First District |
| Respondent | ) | No.    1-06-0928 |
| | ) | |
| v. | ) | Circuit Court, |
| | ) | Cook County |
| Walter Hill, | ) | No.    04 C4 41169 |
| | ) | |
| Petitioner | ) | Hon. Thomas M. Tucker, |
| | ) | Judge Presiding. |
| | ) | |

## PETITION FOR LEAVE TO APPEAL

**FILED**

DEC 3 – 2007

SUPREME COURT
CLERK

Walter Hill
Reg. No. B-58710
Pinckneyville Correctional Center
P. O. Box 999
Pinckneyville, Illinois  62274

R - 081707
RH denied 101907

EXHIBIT F

No. 1-06-0928

RECEIVED

NOV 19 2007

CLERK
SUPREME COURT

## IN THE

## SUPREME COURT OF THE STATE OF ILLINOIS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | Petition for Leave to Appeal from the |
|    Plaintiff-Appellee, | Appellate Court of Illinois, First Judicial |
| -vs- | District. |
| WALTER HILL | |
|    Defendant-Appellant, Petitioner. | No. 1-06-0928 |

## PETITION FOR LEAVE TO APPEAL

TO THE HONORABLE JUSTICES OF THE SUPREME COURT OF THE STATE OF ILLINOIS:

May it please the court:

## I.

### PRAYER FOR LEAVE TO APPEAL

Your Petitioner, Walter Hill, pro se, respectfully petitions this Honorable Court for leave to appeal pursuant to Supreme Court Rule 315, from the judgement of the Appellate Court of Illinois, First Judicial District, which affirmed the judgement of conviction entered by the Circuit Court of Cook County, Illinois upon the guilty, beyond a reasonable doubt finding Petitioner guilty of a Residential Burglary.

## II.

### OPINION AND PROCEEDINGS BELOW

-1-

On July 26, 2005 Petitioner was found guilty beyond a reasonable doubt of Residential Burglary. Petitioner was subsequently sentenced to 14 years. He appealed this conviction to the Illinois Appellate Court, First District. On August 17, 2007 the court delivered its opinion in said appeal, affirming the judgment of conviction and sentence. Petition for Rehearing was filed <u>August 31, 2007 and denied October 19, 2007.</u>

## III.

## <u>POINT RELIED UPON FOR REVERSAL</u>

Walter Hill Was Not Proven Guilty Beyond a Reasonable Doubt of Residential Burglary Where the Evidence of His Presence near the Residence Sometime <u>Before</u> the Burglary, and His Possession of a Few of the Stolen Goods Sometime <u>after</u> the Burglary, <u>Did Not Prove That Mr. Hill Ever Actually Entered the Residence and Stole the Missing Items.</u>

## IV.

## <u>STATEMENT OF FACTS</u>

Walter Hill was charged with a single count of residential burglary. On July 26, 2005, a bench trial was conducted. Kathleen Bily testified that on October 30, 2004, at approximately 8:30 a.m., she and her husband left their home at 437 North Hoben Court in Northlake, Illinois; Mrs. Bily was on her way to work. As Mrs. Bily stepped out the back door of her home, she noticed a man, whom she identified in court as Walter Hill, standing on the lawn by the light post at the

-2-

end of her driveway. She thought it was strange that he was there because she has lived at that location for over 15 years and she did not recognize him. Mr. Hill was standing there looking towards the Bily's house. Mrs. Bily drove while Mr. Bily sat in the passenger seat. As Mrs. Bily backed down her driveway, she watched Mr. Hill at the light post the entire time because she wanted to make sure he did not cross her path as she drove. According to Mrs. Bily, Mr. Hill never moved from his spot. When Mr. Bily testified at the preliminary hearing, however, he said that as they left that morning, he noticed a man walking past the driveway, not standing there.

Mrs. Bily drove to work, and then Mr. Bily returned home. Soon after arriving at work, Mrs. Bily received a phone call from her husband, and he came to pick her up. They went back home and Mrs. Bily saw that her jewelry box had been dumped out onto the bed and the dresser drawers were hanging open. She noticed that some jewelry, a camcorder, and an X-box system as well as games and accessories, were missing. The Bily's called the police and provided them with the serial numbers for the camcorder and X-box. On November 4, 2004, Mrs. Bily, 5 days after alleged burglary to her home, identified Walter Hill in a line up as the man standing by her driveway on the date of the alleged burglary. Mr. Hill had been picked up by the Northlake Police on November 3, 2004 for an entirely different matter that he wasn't even charged for, held twenty four hours after the initial stop was satisfied and then charged was the crime that is now before this court.

Ray Tome, an employee for Village Jewelry and Loan in Melrose Park, testified that as he was working on October 30, 2004, a man, whom he identified in court as Walter Hill, came into the shop.

-3-

Mr. Hill sold Mr. Tome a camcorder and an X-box system for $100. As part of the transaction, Mr. Tome recorded the serial numbers from the merchandise. Mr. Hill did not sell an X-box games or accessories to the pawn shop. Mr. Hill did not sell any jewelry to the pawn shop. On November 4, 2004, Mr. Tome identified Mr. Hill in a line up as the seller of that merchandise.

Corporal Carlos Ortiz of the Northlake Police Department testified that he was assigned to this case on November 3, 2004. After going to the Village Pawn Shop and speaking to Mr. Tome, Corporal Ortiz learned that certain items were pawned on October 30th at around 10:15 am. The serial numbers on the items pawned were the same serial numbers on the items missing from the Bily's home. Corporal Ortiz viewed the sales slips from the pawn shop and saw that the seller's name was Walter Hill. When Corporal Ortiz got back to the station, he began to prepare a patrol bulletin for Hill, but soon discovered that Mr. Hill was already in custody on an unrelated matter.

The circuit court found Mr. Hill guilty of Residential Burglary, noting that Hill's recent, unexplained possession of stolen property, coupled with his presence at the scene before the burglary, was sufficient evidence for a finding of guilt beyond a reasonable doubt.

On August 25, 2005, defense counsel informed the court that Mr. Hill wanted to proceed prose, and Mr. Hill filed a pro se motion for new trial alleging ineffective assistance of trial counsel. Specifically, Mr. Hill alleged that his counsel failed to file a motion to quash arrest and suppress identification, failed to show that the prosecution failed to produce and/or introduce fingerprint and forensic evidence which the lack thereof would exculpate Mr. Hill, and failed to interview and

and call witnesses, such as the arresting officer Carpenter of the Northlake police department who would of testified that the reason for the initial stop was satisfied.

At the same time, defense counsel filed a motion for new trial alleging that the court erred in finding Mr. Hill guilty because there was no direct evidence that he actually entered the house, and that a "mere hunch" was insufficient to support a finding of guilt, and that the was no corroborating evidence to support the circumstantial evidence of unexplained possession of stolen property was also insufficient to support a finding of guilt beyond a reasonable doubt.

On September 9, 2005, Mr. Hill filed a pro se document entitled "Petition for Appeal", in which he alleged that his conviction was based solely on the fact that he sold some merchandise to a pawn shop. He also argued that his arrest was illegal because he was arrested for a different crime he was charged with and held 24 hours in custody before he was identified then charged in this case which this case allegedly occurred 5 days prior to him being charged. Mr. Hill also argued that the State itself admitted during discovery before the court that no fingerprints or forensic evidence tied Mr. Hill to the crime.

On October 4, 2005, Mr. Hill filed a document entitled "Memorandum of Law in Support of Motion for New Trial", which set forth essentially the same arguments as the motion filed on August 25. One additional point Mr. Hill made in his document was that Mrs. Bily's trial testimony was contradicted by Mr. Bily's preliminary hearing testimony that he did not see Mr. Hill standing by the light post but saw a man walking past the driveway.

-5-

On November 1, 2005, Mr. Hill informed the court that, rather than proceeding pro se, he would like to be represented by a lawyer other than the public defender that represented him at trial. A Krankel hearing was conducted on January 25, 2006, to determin the factual basis of Mr. Hill's ineffectiveness claims and whether Mr. Hill was entitled to the appointment of a different public defender. Finding no prima facie case of ineffective assistance of counsel, the trial court denied Mr. Hill's request for another public defender. Mr. Hill decided to go pro se for the rest of the proceedings.

A sentencing hearing was held on March 21, 2006. Based on Mr. Hill's criminal background, the trial court sentenced him as a Class X offender to 14 years of imprisonment.

Notice of Appeal was filed on Apr. 11, 2006.

Circuits ruling was affirmed by the Appeals court on August 17, 2007.

## V.

## ARGUMENT

Walter Hill Was Not Proven Guilty Beyond a Reasonable Doubt of Residential Burglary Where the Evidence of His Presence near the Residence Some time Before the Burglary, and His Possession of a Few of the Stolen Goods Some time after the Burglary, Did Not That Mr. Hill Ever Actually Entered the Residence and Stole the Missing Items.

In criminal prosecutions, the due process clause protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. U.S. Const., amend. XIV; Ill. Const., 1970, Art. 1, § 2; In Re Winship, 397 U.S. 358, 361-64 (1970). The State has the burden of proving beyond a reasonable doubt all of the material and essential facts constituting the crime charged. People v. Weinstein, 35 Ill. 2d 467, 220 N.E. 2d 432 (1996). This burden never shifts to the accused. In this case, in order to prove the offense of residential burglary, the State was required to prove that Walter Hill knowingly and without authority entered Robert Bily's house with the intent to commit a theft therein. 720 ILCS 5/19-3(a)(2004). However, the presented evidence, which was all circumstantial in nature, did not establish that Mr. Hill ever entered Mr. Bily's house and took the missing items. All the States' circumstantial evidence established is that Mr. Hill sold some stolen items to a pawn shop on the same day that the burglary occurred. Therefore, the Circuit Courts finding of guilt beyond a reasonable doubt for Residential Burglary and sentence of 14 years imprisonment, and the Appellate Courts affirming of that same finding cannot stand and must be reversed.

The applicable standard of review is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact, whether judge or jury, could have found the essential elements of the crime beyond a reasonable doubt.

In this case, the State charged Mr. Hill with residential burglary despite having no evidence to prove that he was the individual who broke into the Bily's house. The only evidence presented was the testimony of Mrs. Bily that Mr. Hill was standing outside of the Bily home sometime before the burglary occurred, and evidence that Mr. Hill sold some of

some of the items reported stolen from the house sometime after the burglary. Based solely on Mr. Hill's presence on the scene before the burglary, and his "recent, unexplained possession" of some of the proceeds after the burglary, the trial court inferred Mr. Hill's guilt. However, this circumstantial evidence was insufficient proof that Mr. Hill was the person who entered the Bily's home and stole their possession.

The Defendant, Mr. Hill argued before the Appellate Court that the State has failed to satisfy all three prongs of the Housby test; (1) there is a rational connection between his possession of stolen property and his participation in the burglary; (2) his guilt of burglary more likely than not flowed from his recent unexplained and exclusive possession of burglary proceeds; and (3) there is evidence corroborating the defendants guilt. People vs. Housby, 84 Ill. 2d 415, 428 (1981) The Appellate Court determined that the state met the first prong of the Housby test by stating that the circumstances that defendant sold the stolen property to a pawn shop located approximately two miles from the Bily's residence, approximately 90 minutes after the items were discovered to be stolen are sufficient to satisfy the first prong. The Defendant contends that that doesn't show a rational connection between Mr. Hill's possession of the proceeds and the burglary. No eyewitness ever saw Mr. Hill enter, exit or inside of the Bily's house. There was no evidence that Mr. Hill had ever been inside the Bily's house such as finger prints, hairs, or other items left behind, and no forensic or D.N.A. evidence. The evidence does not support a finding of the first prong or either of the two other Housby requirements. The Appellate Court is incorrect in it's review and decision.

-8-

With respect to the second Housby requirement, there was no evidence that Mr. Hill's guilt "more likely than not" flowed from his possession of the proceeds. It does not make sense that Mr. Hill would stand in front of a house that he intended to burglarize as the occupants looked directly at him as they drove past as Mrs. Bily testified. Nor does it make sense that Mr. Hill would then use his own I.D. to pawn said stolen proceeds if he was the individual who stole them from someones house. Again, there is no evidence marking Mr. Hill as the burglar to the Bily house. Again with respect to the Appellate Court, which stated, "defendant was in possession of the items and sold them approximately 90 minutes after the burglary occured. Examining the plausibility of defendant's current theory that it was someone else who burglarized the Bily's home and not him, against the theory and evidence provided by the State at trial, we find it reasonable for the trial court to conclude defendant was "more likely than not" a participant in the burglary as opposed to a mere subsequent possessor of the proceeds. The Appellate Court again is incorrect. This is not good law as in Housby, 420 N.E. 2d, 155 which held, "To the extent that past Illinois decisions have held that exclusive and unexplained possession of recently stolen property is sufficient, standing alone and without corroborating evidence of guilt, for conviction of burglary, those decisions, in the light of the United States Supreme Court holding in County Court, can no longer be applied, even when the inference is regarded as permissive. The presumption standing alone does not prove burglary beyond a reasonable doubt. The person in exclusive possession may be the burglar, to be sure, but he might also be a receiver of stolen property, guilty of theft but not burglary; an innocent purchaser without knowledge that the item is stolen, or even

-9-

an innocent victom of circumstances".

Just because defendant was in possession of recently stolen property does not mean it is "more likely than not" true defendant was the burglar. Again the Appellate Court was incorrect and the State did not satisfy the Second prong of the Housby test.

Finally, with respect to the third Housby requirement, there was no corroborating evidence of Mr. Hill's guilt. He was never seen inside the house, Mrs. Bily admitted that she did not see not see Mr. Hill holding anything, such as tools or a duffle bag. When Mr. Hill was apprehended 4 days later on a completely unrelated matter to this cas, he was not found in possession of any burglary tools, gloves or weapons. He also did not possess any of the other missing proceeds, such as the video games and accessories, or any of several pieces of jewelry. In addition, no fingerprints or other forensic evidence were found in the house in respect or relation to the Defendant Mr. Hill.

The Appellate Court, in respect to the third Housby requirement states that corroborating evidence in the form of identifications of defendant by Mrs. Bily and Tome, defendants presence and actions near the Bilys' residence immediately before the burglary, and his possession and pawning of the items proximate in both time and place to the burglary. We find that this is sufficient corroborating evidence of his guilt. The Appellate Court is in correct. There is no corroborating evidence. There were no actions of Defendant before the alledged burglary occurred. Defendant sold some established stolen items to a pawn shop. There is no evidence presented then or now by the State that

-10-

defendant burglarized the Bily's home.

The Appellate Courts recent decision in Natal supports the reversal of Mr. Hill's conviction. People vs. Natal, 368 Ill. App. 3d 262, 858 N.E. 2d 923 , Ill. App. Lexis 1053, 306 Ill. Dec. 865 (2006)

In Natal, the complainant returned to his apartment to find evidence that his home had been ransacked, that his V.CR and DVD player had been disconnected and moved, and that the patio door was open. The complainant then observed the defendant standing 20 feet away from his apartment building, holding two pillowcases that had been removed from the complainant's bed.

When the complainant confronted the defendant, he stated, "It wasn't me. The guy just ran away." As the defendant backed away from the complainant, dropping the pillowcases on the sidewalk, the complainant observed him remove a black item from his back pocket and drop it behind a dresser on display on the sidewalk in front of a furniture store. When the police searched the defendant following his arrest, they found a padlock belonging to the complainant's girlfriend, which had been in the apartment. The police also recovered the complainant's black glove from behind the dresser, which contained quarters and a gold necklace. Fingerprints recovered from the apartment did not match the defendants prints. The Defendant explained that he had found the gold chain, locket, money, a glove and pillowcases on the sidewalk.

The Appellate Court reversed the defendants conviction 8 months prior to the present case, noting that the Howsby test was not met.

-11-

The annalysis by the Appellate Court is in error. The Court in Housby stated:
" To the extent that past Illinois decisions have held that exclusive and unexplained possession of recently stolen property is sufficient, standing alone and without corroborating evidence of guilt, for conviction of burglary, those decisions, in light of the United States Supreme Court holding in County Court [v. Allen, 442 U.S. 140, 60 L. Ed. 2d 777, 99 S. Ct. 2213 (1979)], <u>can no longer be applied</u>, <u>even where the inference is regarded as permissive. The presumption standing alone does not prove burglary beyond a reasonable doubt</u>." The person in exclusive possession maybe the burglar, to be sure, but he might also be a receiver of stolen property, guilty of theft not burglary, an innocent purchaser without knowledge that the item is stolen, or even an innocent victim of circumstances".
<u>Housby</u>, 84 Ill. 2d at 423.

The Defendant in the present case brings note here of People vs. Ehlert, 285 Ill. Dec. 133, 811 N.E. 2d 620 (Ill. 2004), were that court held were the defendants case was reversed by the appellate court saying that there was insufficient evidence defendant killed her infant and this court affirmed that decision noting that
" Simply stated, <u>the fact that defendant is "probably"</u> <u>guilty does not equate with guilt beyond a</u> <u>reasonable doubt</u>. We must point out that in criminal prosecutions, <u>the standard of proof is not by a</u> <u>preponderance of the evidence, but rather proof</u> <u>beyond a reasonable doubt</u>."

"What is involved here is the standard of proof which is applicable to all crimes. That is to say, conviction beyond a reasonable doubt. Whether the crime charged be trespass, shoplifting, armed robbery, or murder, the test is the same. The burden of meeting this standard, falls solely on the prosecution. If it fails to meet this burden, a defendant is entitled to a finding of not guilty. No defendant is required to prove his innocence."

"When the state cannot meet it's burden of proof, the defendant must go free".

In the instant case, the State did not meet this burden of proof and the Circuit Court was erroneous and incorrect in finding defendant guilt of burglary beyond a reasonable doubt, and the Appellate Court was also incorrect in upholding defendants conviction based solely on "unexplained possession" of stolen items, without corroborating evidence that defendant was the individual that committed the crime of Residential Burglary upholding a conviction of guilt beyond a reasonable doubt.

Unexplained possession is not supported by case law so it does not support a conviction. The trial court's decision shows that the judge inferred the burglary merely from the defendants possession of the stolen property and ignored the admonition of Housby that unexplained possession of the stolen property, standing alone, is not sufficient to convict. In it's decision the trial court did not discuss the three requirements set forth in Housby for a court to presume guilt based on the

exclusive possession of recently stolen property.

With this present case the permissive inference stands unsupported by corroborating circumstances, (See Housby.)

Where the Housby court held:

"Where a permissive inference stands unsupported by corroborating circumstances, the leap from the proved fact to the presumed element must satisfy the higher standard, proof beyond a reasonable doubt, for there is nothing else on which to rest the fact finders verdict of guilt." See Housby, 84 Ill. 2d at 423.

In Natal, the Appellate Court held that:

" the same (or similar) test can be used by any fact finder to determine the ultimate facts beyond a reasonable doubt. Regardless of which test or rationale a trial court uses to determine guilt or innocence, it must consist of more than the 'exclusive possession of the property in close proximity to the burglary." see Housby, 84 Ill. 2d at 423.

The Appellate Court in Defendant Hill's case upheld a finding of guilt by the Circuit Court based solely on the exclusive possession of the property in close proximity to the burglary. The Appellate Court is incorrect in their opinion. It is contradictory to Housby and to it's on ruling and opinion in the Natal

Court holding on November 20, 2006.

    The record shows that the evidence was insufficient to establish defendant's guilt beyond a reasonable doubt. The Natal case and defendant's case are so similar that the only evidence the trial court could rationally consider in it's decision-making process was the exclusive possession of items that were taken in the burglary and were found in close proximity to the offense. The Appellate Court in Natal in their decision stated: "As previously indicated, such evidence, standing alone, cannot support a guilty verdict of burglary beyond a reasonable doubt."

    Nine months later in the Hill Court, the Appellate Court states that defendants exclusive possession in close proximity to the offense was sufficient to meet the Housby requirements and upheld the trial courts finding of guilt. The Appeals Court decision is incorrect and cannot stand. It's contradictory to the Natal Court (2006); the Ehlert Court (2004); and the Housby Court (1981) as well as the circuit court finding defendant guilty of a Residential Burglary were the State did not meet it's burden of proof, nor did the State meet the 3 prong test requirements established by the Housby Court.

To go one step further, Defendant, with respect to the Appellate court's opinion in reference to its citing of People vs. Burrows, 183 Ill. App. 3d 949, 954-55 (1989), states that the Appellate cannot sufficiently use this case towards Mr. Hill's guilt because the Burrows case and the defendant's case are substantially different where the defendant Mr. Burrows had a rational connection between the fruits of a recent burglary and the defendant's participation in it. There was a showing during the time frame when the crime took place, the defendant and other's, while located only two doors away from the House in question, discussed the fact the house was empty. Defendant's close proximity to the scene of the crime during the time when the crime was known to have occurred, the discussion concerning the burglarized house in his presence, and the appearance of items identified as having come from the house provided a sufficient rational basis to show the connection between the crime and defendant's participation. Whereas in the present case, defendant was alleged to be seen near the Bily residence sometime before the burglary occurred and in possession of some of the missing items sometime after the burglary. Defendant was not at all to have been witnessed in any discussion about any burglary to any residence. There is no rational connection between the defendant and a recently burglarized house based solely on exclusive and unexplained possession of recently acquired stolen property. The Appellate Court is incorrect also, were as [see Hausby] they state that, again, it was "more likely than not" that defendant entered the Bily home with the intent to commit a theft therein or a felony based solely on the testimony that Mr. Bily saw the defendant outside her home and that Defendant sold some of her items 90 minutes, approximately, after the burglary occurred. It is still unexplained

-16-

possession.

In the Housby Court, that strongly relied on the decision by the United States Supreme Court in County Court v. Allen (1979), 442 U.S. 140, 60 L.Ed. 2d 777, 99 S. Ct. 2213, the Housby court stated: " Yet, while there may be a strong probability that the inference is accurate, this does not mean it is "more likely than not" true that the possessor of the property is the burglar. Although the inference has a long history of use in this State going back to at least 1885 (Smith v. People (1885), 115 Ill. 17, 3 N.E. 733) no court opinion has yet pointed out why it is more likely that the possessor is the burglar instead of one who received stolen property or simply joined the burglar after the crime had been committed.

Expressions of certainty or long historical practice are not acceptable substitutes for reasoned explanations of why the presumed fact more likely than not flows from the proved fact. The analysis provided by past Illinois decisions clearly does not satisfy the County Court test."

Defendant here states that his case before this honorable court that his recent unexplained possession of recently stolen property, standing alone, in light of the Housby Court, the Ehlert Court, and the Natal Court, cannot be acquated with guilt beyond a reasonable doubt and therefore cannot stand and the finding of guilt by the Circuit Court and the upholding of that finding by the Appellate Court must be reverse for it is in violation of the Defendants Due Process of Law Rights. Defendant still remains to this day that he is not the burglar to the Bily home.

-17.-

# VI.

# CONCLUSION

Wherefore, based on the facts that the State did not meet it's burden of proof and the State did not meet all three requirements of the Housby test, And the Circuit Court finding defendant guilty beyond a reasonable doubt based solely on the exclusive possession of stolen items in close proximity to the offense which was by law insufficient to meet the Housby test requirements and find a defendant guilty of burglary beyond a reasonable doubt, your Petitioner respectfully requests this Honorable court to grant his petition for leave to appeal and reverse his conviction of Residential Burglary and sentence as well as the circuit courts order requiring Mr. Hill to submit blood specimens for genetic analysis.

Respectfully submitted,
Walter L. Hill B58710
Walter L. Hill B58710

Defendant-Appellant, Petitioner
Pro Se

Box 999
Pinckneyville, Il
62274-3410

-18-

STATE OF ILLINOIS
SUPREME COURT

At a Term of the Supreme Court, begun and held in Springfield, on Monday,
the fourteenth day of January, 2008.

Present: Robert R. Thomas, Chief Justice
Justice Charles E. Freeman        Justice Thomas R. Fitzgerald
Justice Thomas L. Kilbride        Justice Rita B. Garman
Justice Lloyd A. Karmeier         Justice Anne M. Burke

---

On the thirtieth day of January, 2008, the Supreme Court entered the
following judgment:

No. 105686

People State of Illinois,

    Respondent

    v.

Walter Hill,

    Petitioner

Petition for Leave
to Appeal from
Appellate Court
First District
1-06-0928
04C441169

The Court having considered the Petition for leave to appeal and being fully
advised of the premises, the Petition for leave to appeal is DENIED.

As Clerk of the Supreme Court of the State of Illinois and keeper of the
records, files and Seal thereof, I certify that the foregoing is a true
copy of the final order entered in this case.

IN WITNESS WHEREOF, I have hereunto
subscribed my name and affixed the Seal
of said Court, this sixth day
of March, 2008.

*Juleann Hornyak*

Clerk,
Supreme Court of the State of Illinois

105686

**SUPREME COURT OF ILLINOIS**
**CLERK OF THE COURT**
SUPREME COURT BUILDING
SPRINGFIELD, ILLINOIS 62701
(217) 782-2035

January 30, 2008


Hon. Lisa Madigan
Attorney General, Criminal Appeals Div.
100 West Randolph St., 12th Floor
Chicago, IL 60601

No. 105686 - People State of Illinois, respondent, v. Walter
            Hill, petitioner.  Leave to appeal, Appellate
            Court, First District.


The Supreme Court today DENIED the petition for leave to appeal in the above entitled cause.

The mandate of this Court will issue to the Appellate Court on March 6, 2008.

EXHIBIT G